486

[Civ. No. 7931. Second Appellate District, Division One.—July 2, 1934.]

GARABED EZMIRLIAN et al., Appellants, v. PAUL J. OTTO, Respondent.

Walter L. Mann for Appellants.

C. E. McDowell for Respondent.

HAHN, J., *pro tem.*—This appeal comes to us from a judgment of nonsuit rendered in an action wherein the complaint contains two counts. The first is a cause of action for damages for alleged slander of plaintiffs' title to lots 1 and 4 of block E of Vista Del Mar tract. The second is in the form of common count for money had and received.

Defendant based his motion for a nonsuit on the following grounds:

"1. That the plaintiff in this action has failed to prove the existence of any malice on the part of the defendant.

"2. That the plaintiff has failed to prove the issuance of any false statement either in writing or orally by the defendant.

"3. That the plaintiff has failed to prove any damages resulting from any act of the defendant.

"4. That the cause of action, if any, of the plaintiff is barred by the provisions of subdivision 4 of section 338 of the Code of Civil Procedure, and

"5. On the ground there has been a settlement between the parties, as shown by the evidence on the part of the plaintiff."

In granting defendant's motion, the trial court indicated it was granted on the ground of insufficiency of evidence to prove malice on the part of the defendant. However, if the court's ruling can be supported on any ground, whether stated or not, the judgment must be affirmed. (*Anchester* v. *Keck et al.*, 214 Cal. 207 [4 Pac. (2d) 934]; *Miller* v. *Wade*, 87 Cal. 410 [25 Pac. 487].)

It is a well-established rule that when the granting of a motion for nonsuit is under review, all of the evidence favorable to plaintiff will be given its full probative value without regard to the conflicts, and only such inferences as are favorable to the plaintiff's side of the controversy will be indulged. (*Gonzales* v. *Davis*, 197 Cal. 256 [240 Pac. 16]; *Murray* v. *Southern Pac. Co.*, 89 Cal. App. 741 [265 Pac. 337]; *Rabe* v. *Western Union Tel. Co.*, 198 Cal. 290 [244 Pac. 1077].) Guided by the rule thus stated, the facts necessary to a consideration of the points here raised may be fairly summarized as follows:

Plaintiffs are Armenians, one of whom, Goorjian, a vegetable peddler, could neither read nor write the English language. The other, Ezmirlian, could read and write, but with limited ability to understand English, especially when spoken and written in other than simple terms. About the year 1920, defendant, who is an attorney at law, was first employed by plaintiff Ezmirlian to attend to some legal matters for him. Between that time and July, 1923, defendant frequently acted as legal adviser and attorney for Ezmirlian. Indeed, such was the confidence each reposed in the other that on a number of occasions, when defendant was acquiring real property, or an interest therein, he caused the title to be taken in the name of Ezmirlian, who always signed any documents relating to such transactions when requested so to do by defendant.

In 1923, Ezmirlian, who was the owner of six lots in the Signal Hill oil district, requested defendant to negotiate an oil lease for him on these lots. As compensation for defendant's services to be rendered in connection with this proposed oil lease, Ezmirlian agreed to pay defendant one-fourth of the amounts which he would receive in bonuses and royalties under the lease.

In July, 1923, after defendant had succeeded in negotiating the oil lease on Ezmirlian's six lots, plaintiffs, who were joint owners of the two lots involved in this action, requested of defendant that he find a lessee to drill for oil on these two lots. In this connection it was agreed that if defendant consummated a satisfactory oil lease on the lots in question, that they would pay him for his services by giving him the same share in any bonuses and royalties received by them as he received under his agreement in connection with the oil lease on Ezmirlian's six lots.

Pursuant to this arrangement, defendant consummated with one Hugh R. Kennedy an oil lease on the two lots in question, which lease was executed by the parties on July 23, 1923. By the terms of this lease, the plaintiffs were to receive a bonus of $500 and a one-fifth royalty in all of the oil and gas recovered from the property by the lessee. About the time the lease was consummated, the defendant suggested to plaintiffs that in order that he be protected in his share of the royalty, in the event that anything happened to plaintiffs, he wanted them to sign a paper

showing his right to share in the royalties paid under the lease. To this proposal plaintiffs agreed, and two or three days later, at the request of the defendant, they called at his office, where defendant read to them an instrument which was designated "assignment of oil and gas royalties". After this instrument had been read, the plaintiff Goorjian asked what was meant by five per cent of the total gross production of oil and gas; that he understood the agreement was to provide that defendant was to receive one-fourth of the amount of bonuses and royalties paid to plaintiffs by Kennedy under the lease. To which inquiry reply was made that five per cent of the oil and gas produced was the same as one-fourth of the amount of royalties received by them. Thereupon, plaintiffs signed the instrument, the essential provisions of which read as follows:

"Witnesseth: Whereas, the parties of the first part are the owners of Lots One (1) and Four (4) in Block 'E' of the Vista Del Mar Tract No. 2, as per map recorded in the office of the County Recorder of Los Angeles County in Book 10, Page 158 of Maps, Records of Los Angeles County; and

"Whereas, the parties of the first part have executed a lease upon said property above described to Hugh R. Kennedy;

"Now, Therefore, the parties of the first part herein, for Ten ($10.00) Dollars to them in hand paid and for good and other valuable consideration, to-wit, for Attorney's fees and services rendered to the parties of the first part by the party of the second part, hereby grant, bargain, sell, assign, transfer and convey unto the said Paul J. Otto, the party of the second part, five (5%) per cent of the total gross production of all oil and gas produced from the following described property:" (Here follows a description of the two lots above referred to.)

Kennedy failed to do the drilling as required under the terms of the lease and after some months, during which the time limit for drilling was extended several times by plaintiffs, the lease was cancelled by mutual consent. Prior to the cancellation of the lease, however, Kennedy had paid in bonuses and sums agreed to for extensions of time within which to drill, the sum of about $3,000, one-fourth of which amount was retained by defendant.

Upon the cancellation of the Kennedy lease, the plaintiffs discussed with defendant the matter of securing another lessee, and defendant agreed to undertake to consummate another oil lease on their two lots with the understanding that he was to have as compensation for his services the same share or interest in the bonuses and royalties provided for and paid under such new lease, as had been agreed to for his services in the Kennedy lease.

Defendant's efforts to consummate another lease satisfactory to plaintiffs, however, were not successful, and after a period of some four years, during which there was no activity in drilling on the property in question, plaintiffs entered into negotiations with one Edward Whitley for the sale of the two lots to him for a consideration of $15,000. The plaintiffs advised defendant of their negotiations and desire to sell, and requested him to represent them in the negotiations and the consummation of the deal through a proposed escrow. The defendant at this time was otherwise occupied, and called in his associate and assistant, one Roy C. Kaiser, who was instructed by defendant to look after the interest of the plaintiffs in the transaction. Kaiser thereupon accompanied plaintiffs to the bank in Long Beach, where the escrow was to be placed, and under his direction and advice plaintiffs signed the necessary documents by which they agreed to convey to the purchaser a clear and merchantable title to the two lots, and furnish to the purchaser a contract of guarantee of title executed by the California Title Insurance Company. Several days later defendant called Ezmirlian to his office in connection with some other business matters, and while there asked Ezmirlian how they were "going to take care of him"? Ezmirlian replied that they expected to pay him $250 for his services in connection with the escrow, which was the amount the defendant on a previous occasion had fixed as his fee for similar services in a real estate transaction wherein he represented Ezmirlian. Defendant thereupon expressed dissatisfaction with the amount suggested for his fee, and after an extended argument displayed anger, and finally in a somewhat excited manner and tone of voice, told Ezmirlian that he wanted one-fourth of the sale price of the property. Ezmirlian protested payment of any such sum, claim-

ing that he had no interest in the property and that the sum of $250 was a fair compensation for the services rendered by him through his associate Kaiser in the matter of the escrow.

Two days later, defendant called plaintiffs to his office, when the matter of the compensation he was to receive was again discussed. Plaintiffs testified that at the conference defendant was greatly wrought up and indulged in a tirade of abusive and insulting language to them, and threatened them with dire results if they did not pay him the amount he demanded. According to defendant's own testimony of what occurred he "got mad instantly, lost his head, blew up", and called plaintiffs "a couple of damn crooks". When plaintiffs persisted in their refusal to meet defendant's demands, defendant shouted: "God damn it, I am going to fix you." Thereupon he called his clerk, handed her the "assignment of oil and gas royalties" executed four years before in connection with the Kennedy oil lease, and told her to record it. The instrument was forthwith recorded. On August 16th, at the request of the title company that was to furnish the guarantee of title, defendant executed and forwarded to it a quitclaim deed for the purpose of clearing the title of the cloud occasioned by the recorded assignment, but with the proviso that it was to be used only in the event he was paid the sum of $3,652.50 on or before August 30, 1928. It does not appear that plaintiffs had anything to do with the title company's request to defendant to forward the quitclaim deed.

On August 23d and again on August 27th, plaintiffs with Walter L. Mann, their new counsel, called upon defendant and endeavored to settle the controversy so as to permit the sale to go through, on which occasions defendant refused to accept any less than one-fourth of the sale price. At these conferences he was told by plaintiffs and their attorney that Whitley, the purchaser, had entered into a contract to resell the lots for $22,500, and that although plaintiffs had requested Whitley to cancel the agreement, because of the trouble plaintiffs were having with the cloud on the title, Whitley had refused to do so and had threatened plaintiffs with a damage suit if they failed to convey title to him in accordance with the escrow instructions. Defendant persisted in his refusal to remove the cloud except on payment

of his demand, and on the following day plaintiffs sent him a letter making a written demand upon him to quitclaim the cloud which was occasioned by the recording of the assignment, and further, advised him that in the event of his refusal so to do, they would hold him liable for any damages they suffered by reason of such refusal. On the same day, plaintiffs directed a letter to the title company instructing them to pay the sum demanded by the defendant and use the quitclaim deed, so as to remove the cloud, and thus enable the consummation of the sale.

Weighing the evidence as we must on an appeal from a judgment of nonsuit, we are constrained to hold that the trial court erred in granting defendant's motion.

As to the ground assigned by the court for granting the motion, we are of the opinion that there is sufficient evidence in the record to have justified the jury in finding that defendant was prompted by malice when he caused the assignment to be recorded which clouded plaintiffs' title. The Kennedy lease had been canceled by mutual consent, with the knowledge of defendant, at least three years prior to the recording of the assignment. Hence, unless the assignment conveyed to him an interest in the lots, the recording of the assignment served no purpose except to cloud plaintiffs' title. While respondent does not in his brief directly assert that the legal effect of the assignment was to convey an interest in the property, his contention that the recording of the document "was not wrongful" must be based, if sustained, on the premise that it did convey to him an interest in the property which he had a lawful right to protect by its recordation.

Assuming that the legal effect of the assignment is pertinent to the inquiry, no difficulty would be encountered in reaching the conclusion that it was intended by the parties, and in fact did operate to convey only a share in the royalties payable under the Kennedy lease. The language of the document is conceded by respondent to be ambiguous. Inasmuch as it was prepared by defendant, the rule that where the language of a document is ambiguous, it will be interpreted most strongly against the party who caused the uncertainty to exist, would apply. (Sec. 1654, Civ. Code.)

▊ In view of this ambiguity, oral testimony was competent to show the circumstances leading up to, and the intention of the parties in the execution of the instrument.

▊ The testimony of plaintiffs was unequivocal in the assertion that the assignment was intended to put in written form their previously agreed to arrangement to give defendant, as compensation for his services in the Kennedy lease, one-fourth of the royalties and bonus they received under the lease. Furthermore, plaintiffs testified they executed the assignment in the belief and on the representation of defendant, who then was acting as their attorney, that such was the effect of the document. It would seem that by reason of these considerations there can be no escape from the conclusion that at the time the assignment was recorded defendant had no interest in the lots that justified the recordation of the instrument. With this legal conclusion as a premise, the jury might well have found from the evidence relating to the conduct of, and language used by the defendant, as also his threat "to fix them" that as a lawyer he well knew the assignment conveyed to him no interest in the lots, and as a party to it, he knew that the document was never intended so to do, and as a conclusion from these findings that his action in recording the document was prompted by malice.

In the case of *Coley* v. *Hecker*, 206 Cal. 22 [272 Pac. 1045], the court had under consideration the question as to the nature of the cause of action set up in the complaint, wherein it was alleged that the defendant "acting maliciously and with an evil purpose of vexing and annoying plaintiff" had filed of record, in the county in which plaintiff owned real estate, an abstract of a judgment he had obtained against plaintiff in an action wherein the judgment had been previously stayed by a good and sufficient bond on appeal. The court in holding the action one for damages for slander of title said: "The phrase 'slander of title' is a figure of speech in which the title is personified. In the instant case the phrase seems to be an anomaly as applied to a situation which, strictly speaking, is a libel upon the title, inasmuch as the damage was accomplished by the recordation of a written document and no spoken words were uttered. However, the term 'slander of title'

includes both spoken and written means by which the right of property may be invaded, and a right of action exists irrespective of the means by which the title is traduced. This is so because a property right had been invaded—an injury to real property has been sustained. 'Persons may have a right in or to a thing—right of property—and this right may be invaded by language concerning the thing. When this invasion occurs, the language which affects a thing is actionable.' . . . Appellants further contend that the recording of the abstract of judgment, if it gives rise to any cause of action, is one for malicious abuse of process, and consequently is a personal action, the venue of which is at appellants' place or residence. We think there is no merit in the contention that the facts alleged state an action for the abuse of process rather than slander of title. It was the filing, maliciously and falsely, of a document which clouded the title of respondent that caused the injury. The effect would be the same had said document been a forged deed, rather than an authorized abstract of judgment.''

◼ Respondent urges that the plaintiffs in ordering the title company to pay defendant's demand ''shows that a settlement was arrived at between the parties''. In legal parlance the term ''settlement'' implies a meeting of the minds of the parties to a transaction or controversy. The evidence not only fails to support a finding of meeting of the minds, but on the contrary abundantly supports plaintiffs' contention that they ordered payment of defendant's demand in order to avoid a greater disaster in the purchaser's claim for damages, if they failed to fulfill their contract. If defendant had any right in the property, but the extent of such right or interest had alone been in controversy, then there might be merit in respondent's theory that in ordering the payment to defendant a compromise of the controversy had been arrived at. Plaintiffs in their written demand to defendant, at the very time they ordered payment of his claim, gave him notice they would hold him liable for any damages they suffered by his refusal and failure to release the cloud on their title.

◼ Respondent next urges support of the judgment of nonsuit on the ground that: ''The alleged first cause of action of appellants' complaint does not state a cause of action'' because the complaint fails to recite that the re-

corded assignment conveyed any interest in the lots to defendant.

There is no merit in this point. The very gravamen of plaintiffs' complaint is that the assignment gave defendant no interest in the property, and that therefore his recordation of the document was wrongful and prompted alone by a desire to vex and annoy plaintiffs, and thus force them to pay him a sum of money to which he was not legally entitled. In urging this point, it would seem that respondent places himself in a unique position because his argument in support of the court's ruling that plaintiffs failed to prove malice was, as pointed out, necessarily based on the premise that the assignment did convey to defendant an interest in the property.

The last of the points urged by respondent in support of the court's ruling is stated as follows: ''The respondent is not liable to appellants under the common counts since he has not been guilty of either duress, oppression or fraud.''

''The basis of the action for money had and received is that the defendant has money which in equity and good conscience he ought to pay to plaintiffs.'' (17 Cal. Jur. 602.)

As already indicated in the views expressed, there is abundant evidence that would have justified the jury in finding that plaintiffs paid the money under duress. Section 1569 of the Civil Code defines duress as: ''2. Unlawful detention of the property of any such person.'' It is well established in our practice that an action for money had and received will lie to recover money paid by mistake, under duress, oppression or where an undue advantage was taken of plaintiffs' situation whereby money was exacted to which the defendant had no legal right. (*Minor* v. *Baldridge*, 123 Cal. 187 [55 Pac. 783].)

Defendant's action in causing the recordation of the assignment at the time he did, when he well knew it neither conveyed, nor was it intended to convey to him any interest in the property, was undoubtedly motivated by a purpose to prevent the consummation of the sale of the property, or compel plaintiffs, in order that they might convey title as they were under contract to do, to pay him one-fourth of the proceeds derived from the sale of the property to which

he had no lawful right. That such action operated to take undue advantage of plaintiffs and constituted an unlawful detention of their property cannot successfully be denied.

In view of the considerations pointed out, and the conclusions indicated, we are of the opinion the trial court erred in granting the nonsuit.

Therefore, the judgment is reversed.

Houser, Acting P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 26, 1934, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 30, 1934.