[Civ. No. 8915. Third Dist. Feb. 13, 1957.]

GEORGE KALAJIAN, Respondent, v. HENRY NASH, Appellant.

Frederick L. Hilger for Appellant.

Daniel S. Carlton and Robert A. Haughwout for Respondent.

PEEK, J.—In an action for slander of title to certain timber rights in land, plaintiff was awarded damages against the defendants Nash, Johnson and Pepper. Their motion for new trial was denied, and the defendant Nash alone has appealed.

Since appellant's statement of facts fails to make any reference whatsoever to the record as provided by rule 15(a) of Rules on Appeal, we have chosen to disregard the same and have reviewed the record in light of the statement contained in respondent's brief which is adequately supported by appropriate references.

The record discloses that in April, 1952, Kalajian, a sawmill operator, entered into a written contract with a Mr. and Mrs. Douglas for the purchase of all the merchantable timber on certain real property owned by them. The termination date for the removal of the timber was agreed to be June, 1953, but through a mutual mistake in the final draft of the contract, the date was erroneously stated to be June, 1952. During the month of June, and while the plaintiff was in possession of the real property, it was sold, subject to his rights, by the Douglases to Hayes C. and Lulu Goe. In October of that year plaintiff's mill was destroyed by fire. At that time he estimated he had approximately 500,000 feet of down timber and somewhat more than a million of standing timber. He immediately began negotiations for the sale of the timber with a Mr. Logston, who in turn introduced him to the defendant Nash as his partner. Plaintiff's price of $30 for the down logs and $8 for the standing timber was agreeable to Nash who stated he could get over two and one-half million feet off the land, and if plaintiff could get an extension on the time for removing the timber, he (Nash) would purchase the same. Plaintiff told Nash that the correct termination date was 1953, and that he would have the contract reformed to express the true date at any time he had a legitimate sale for the timber. Nash was so informed personally by the attorney for the Douglases that the matter could be straightened out. Kalajian gave Nash copies of the agreement he had with the Douglases and copies of all of the documents in the case which the Douglases had filed

against him for the balance due on their contract, and Nash kept the same for some two or three weeks. During these conversations, Nash informed plaintiff that he frequently made his deals using the names of members of his family and also that of his bookkeeper; and that he did so in order to effect tax savings. Nash continued to show interest in purchasing the timber and at one time called upon plaintiff with a woman whom he introduced as Mrs. Johnson, his secretary or bookkeeper, for the purpose of drawing up a contract. Plaintiff later learned that she was the defendant Pepper. He had never seen the defendant Johnson until he did so in court at the time of the trial. Plaintiff's negotiations with Nash continued until January 18 or 19, 1953. It was then agreed that plaintiff would meet Nash at Weaverville and go with him to the office of the attorney who had represented the Douglases. However, he received a telegram from Nash informing him that he would be delayed. A few days thereafter plaintiff went to Nash's home in Garberville and there arranged to accompany Nash to the attorney's office on the following morning. When he called for Nash to go to Weaverville, Nash refused to talk to him, and he was informed by Logston that the deal was off and that their attorney had told them to have nothing to do with it.

The following day plaintiff offered the timber to the L. & W. Lumber Company, and it was accepted; but before they could start operations he received a letter dated February 3, 1953, from an attorney representing the defendant Johnson, informing him that she had purchased the timber and he was to keep off the premises. The contract from the Goes to Johnson was dated January 8, 1953, approximately 10 days prior to the termination of the negotiations between plaintiff and Nash. Upon learning of the letter, the company refused to proceed. Plaintiff then talked with one Wheelock who likewise agreed to buy the timber, but he also refused upon learning of the Johnson letter.

The Douglases, when called as witnesses for the plaintiff, testified that they informed Goes that plaintiff had until June, 1953, to remove the timber, and that the escrow instructions which were set up for that sale specifically referred to plaintiff's contract with them. They further testified that prior to the sale to Kalajian they had quoted a price to Goe of $14,500, but that when they again talked to Goe after the sale of the timber to Kalajian they told Goe the price would be $9,500.

Hayes C. Goe testified he had never met defendant Johnson; that he had no copy of the contract between himself and her; that all of the negotiations were carried on by Nash; and that all of the documents were prepared by the defendant Pepper. He further testified that the price of $1,500 was for a mill site; that the timber was an unimportant part of the deal; that all of the parties knew of plaintiff's rights; that because he did not want to appear to be selling something he had no right to sell, he had a specific reference inserted in his contract with Johnson relative to plaintiff's interest.

Neither the defendant Johnson nor her husband had ever owned any timber before. Her testimony, when called under section 2055 of the Code of Civil Procedure, was that her sister, the defendant Pepper, acted for her throughout; that she never saw the timber in question; that she did not meet Goe until the time of the trial; that she received all of her information from Nash, and neither Nash nor her sister ever told her that he had been negotiating for the property; that she didn't consult an attorney concerning the effect of plaintiff's contract; that she didn't give Goe a signed copy of the contract, and she didn't know where her copy was. She further testified she contemplated setting up a portable sawmill and selling the lumber to the company for which she was working; that the money which she used to make the purchase had been kept by her in a safety deposit box in a Eureka bank; that she gave the money in cash to her sister; that when she was in Oregon she kept the money in her home in order that it might be available in the evening if a deal was presented to her; but that when she moved to Eureka she didn't see so many people who were interested in buying timber, and hence she put the money in the bank.

Pepper and Nash were the only witnesses who testified for the defense. Their testimony was essentially a denial of the evidence introduced by plaintiff, and hence merely created a conflict which the trial court in its memorandum opinion noted did not "impress" him and which, by the judgment, was quite obviously resolved against them.

The pertinent findings of the trial court were that Pepper and Johnson were the agents of Nash; that defendants, with full knowledge that plaintiff's rights would not expire until June, 1953, purchased these timber rights from Goe; that, with full knowledge, they caused the letter of February 3 to be written, and the contract to be recorded on February 8; that such acts constituted a publication of

matter which was slanderous and untrue; that, as a result, plaintiff was prevented from selling the timber; that all of the defendants conspired together to defraud plaintiff; and that, by reason thereof, plaintiff had been damaged in the sum of $13,680.

Nash now contends: (1) That the evidence was insufficient to sustain the finding that Pepper and Johnson were acting as his agents; (2) that there could be no slander of plaintiff's title, since the recorded contract showed that his rights had expired; and (3) that any publication of the letter of February 3 was attributable to plaintiff. We find no merit in any of these contentions.

There can be no question but that the evidence, as summarized, was amply sufficient to support the trial court's finding that Johnson and Pepper were acting as Nash's agents; that all three had knowledge of the mutual mistake in plaintiff's contract with the Douglases; and that all three conspired to slander plaintiff's title.

 It is the well-established rule that " 'One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused.' " (*Gudger* v. *Manton,* 21 Cal.2d 537, 541 [134 P.2d 217].) In that case the defendants levied and recorded a writ of execution upon all interest of plaintiff's wife in real property standing in his name and which was his separate property. With full knowledge of such facts defendants refused to release the execution. The court concluded such action constituted slander of title and affirmed a judgment for the plaintiff husband. The court therein, further citing and relying upon Restatement of Torts, section 624, held, "If the matter is reasonably understood to cast doubt upon the existence or extent of another's interest in land, it is disparaging to the latter's title where it is so understood by the recipient. (Rest. Torts., § 629.) As we have seen, the reasonable imputation of the recording was a claim of an interest adverse to plaintiff's title."

It necessarily follows that under the rule enunciated in the Gudger case the judgment is amply supported by the findings here. That case is likewise authority for the **further**

rule which is a complete answer to appellant's final contention, to wit, that any publication of the letter was attributable to plaintiff and any damages suffered were the result of his own act. In that case a like contention was made and the court held that, "... Certainly plaintiff was justified in not concealing the existence of the execution. He might well be committing fraud if he did not divulge the information or represented that the title was clear ... That would not constitute a publication which would bar him from recovery. The real publication, as we have seen, was the recording of the execution. Regardless of whether plaintiff had informed the purchasers of the execution, it was a matter of record, and it would in practically all instances be discovered by the prospective purchaser before the transaction was completely consummated ... A policy fostering the exercise of good faith and fair dealing would require the owner of property to inform a purchaser of what the record showed, although he would in all probability discover it in any event. ..." (21 Cal.2d 556.)

The judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.