[Civ. No. 23112. Second Dist., Div. Three. July 27, 1959.]

HATTIE M. WRIGHT, Respondent, v. ALAN ROGERS et al., Appellants.

Ivan R. Wainer for Appellants.

Daniel G. Marshall and Stanley Moffatt for Respondent.

VALLEE, J.—This is a suit to cancel a grant deed and three deeds of trust, to quiet title to two parcels of realty, for damages and other relief. The judgment was for plaintiff canceling the grant deed and the three deeds of trust, quieting her title to the two parcels of realty, and awarding her $2,000 compensatory damages and $2,000 punitive damages against certain defendants.

The defendants are: Alan Rogers; his wife, Gersha Rogers; Josef S. Noble; Warrog, Inc., a corporation, doing business as Majestic Homes, called Warrog or Majestic; Olympia Mortgage Company, called Olympia; Canoga Park Savings and Loan Association, called Canoga; Fannie Freedman; Consolidated Escrow Company, a corporation; and Title Insurance and Trust Company.

Alan Rogers was president of Warrog; Jack Warnick, its secretary. They were its only stockholders. Olympia was a licensed broker engaged in procuring loans. Noble was office manager of Olympia.

Since 1950 plaintiff, a widow, with insignificant business experience, has been the owner and in possession of two lots: 60 and 61. Lot 61 was at all times improved with a residence in which plaintiff resided. Prior to January 1957 Lot 60 was unimproved. On April 1, 1956, Lots 60 and 61 were encumbered with a first deed of trust in favor of Orange Savings and Loan Association in the approximate amount of $1,736.80, payable $42 a month, and with a second deed of trust in

favor of Gubiotti in the approximate amount of $5,333.55, payable $48.50 a month. Plaintiff worked at the county hospital. Her take-home pay was about $200 a month.

About April 1, 1956, a man named Anthony, an employee of Warrog whom plaintiff did not know, called on her at her home. Anthony told plaintiff he was with Majestic Homes and asked her if she would be interested in buying a house for Lot 60. Anthony told her Majestic was in the business of finding vacant lots on which to move houses from the freeway. He told her the offer was "with 100 per cent financing," she would not have to have any money to pay down on the property, and when the house was "put in" she could pay for it out of the rent she collected. Plaintiff told Anthony she was not interested, she owed too much money on the property and did not care to go into it.

About a week later Anthony again called on plaintiff. He asked her if she had thought over what he had said. Plaintiff told him she had but she did not "want to go into getting the house," that she was tired, had just come from work, her son had recently been killed, her mother had died, and she was too worried to be bothered with anything. Anthony told her she would not have to do "too much worrying about it"; they knew how to arrange the deal for her; all she would have to do was sign the papers; the necessary arrangements would be made; she would get it with 100 per cent financing; and she could pay for it with payments as low as rent.

About two weeks later Anthony telephoned plaintiff and asked her if she would "like to go and look" at some houses, perhaps if she saw one she liked "maybe" she would think about getting one. About May 1, 1956, Anthony showed her "A court of houses." Plaintiff told him, "I don't like any of these houses and I still can't see how I could get a house anyway, I owe too much for my present property." Anthony then took her to the office of Majestic Homes and introduced her to Warnick, who showed her photographs of houses. She saw one she thought she would like. Warnick told her that if she liked it they could make arrangements "for getting it." The next day Anthony drove her to Tarzana to see that house. On the trip Anthony told her she could not go wrong in getting a home; Majestic was a very reliable company; he had known them quite a while; they had helped him invest his money; he had been a tailor and had only been able to save a certain amount of money; and since he had been with

Majestic they had enabled him to invest his money so that he was now the owner of five houses. Plaintiff told him she liked the house but did not see how she could get it.

Plaintiff and Anthony returned to Majestic's office and plaintiff saw Warnick. Anthony said plaintiff "liked the house and she wants to see if she can make some kind of a deal about the house." Warnick told her: "The house would cost you about $6,000"; "For $1,500 we could move the house in on your lot and complete it." Plaintiff testified: "I said, 'All right.' I thought that that would be O.K. I told him that I had never entered in any legal matters before, that I didn't know anything about buying real estate, and he told me that I didn't have to worry about it, that they were a reliable company, that he would see to everything for me and that I would just have to sign the papers."

The next day Warnick went to see plaintiff's property. He said to her: "Mrs. Wright, I came to look over your place and to see how large the lot was and everything"; "You have got a gold mine here"; "It would be foolish not to put a house on the lot. You could be making money out of it."

The following day an escrow was opened for the purpose of obtaining a loan. On May 24, 1956, plaintiff signed an instrument in which Majestic Homes, a partnership, agreed to sell and she agreed to buy the house she had seen at Tarzana. The agreement provided plaintiff would pay Majestic Homes, a partnership, $7,692; the parties would open an escrow for the consummation of the agreement; and plaintiff would deposit in the escrow a promissory note covering the deferred balance of the purchase price ($7,692) with interest at 7.2 per cent per annum, a deed of trust on Lots 60 and 61 as security for the note, and a chattel mortgage on the house. The agreement also contained this provision: "Tree Service 270$\frac{00}{}$ 1500$\frac{00}{}$ for completion to be added to note Majestic Homes guarantees financing Price includes escrow, sales tax, bond, Bldg permit Insp, Fire Insurance." It recited that Alan Rogers and Jack Warnick were the partners in Majestic Homes, a partnership, and that it would not be valid or binding on the seller unless signed by either Rogers or Warnick. It was not signed by either of them. Plaintiff understood that under the agreement Majestic Homes would refinance her property "100 per cent," the two encumbrances on the property would be paid, and she would then pay Majestic. On May 25, 1956 plaintiff signed escrow instructions, a note payable to Warrog, doing business as Majestic

Homes, in the amount of $9,462, payable on or before December 1, 1956, with interest at 7.2 per cent payable at maturity, a deed of trust covering Lots 60 and 61 securing the note, and a chattel mortgage on the house. The escrow instructions provided that the deed of trust securing the $9,462 note should be a third deed of trust, and contained this provision: "Majestic guarantees refinancing for amount of principal balance at maturity provided there are no additional liens against property and provided first & second trust deeds have been paid up to date, and provided notice of completion has been filed."

On August 3, 1956, the note for $9,462 was delivered by the escrow holder to Warrog and a bill of sale of the Tarzana house was mailed to plaintiff. The Tarzana house was moved onto Lot 60 in September 1956 and was ready for occupancy about the middle of January 1957. On October 12, 1956, Warrog sold the note to Fannie Freedman for $8,515.80 and assigned the deed of trust executed by plaintiff on May 25, 1956, to her. In November 1956 plaintiff asked Warnick when she should start making payments to Majestic. He told her not to worry about it, that he would let her know, just to continue making payments on the prior deeds of trust.

In the first week of January 1957 Warnick told plaintiff to go to Olympia Mortgage Company and see Noble "to make an application for the loan for the refinancing of the house." Plaintiff saw Noble, who prepared an application for a loan which she signed. Noble told her the monthly payments would be $160 or less and that the interest would be 7 per cent. About January 19, 1957, at Noble's request, plaintiff again went to Olympia. Plaintiff testified: "Q. What was said by each of you in that conversation? A. Mr. Noble said that he had some more papers for me to sign. I said, 'I have signed so many papers already.' I said I didn't know there were so many papers to sign. He said these were the usual legal papers to be signed in matters dealing—dealings like this, and— . . . And I told Mr. Noble, as I said before, that I was a widow and that I hadn't had any business dealings before, and that I didn't know too much about real estate. He told me that his company, too, was a reliable company, that he wouldn't lead me wrong, and that his mother was a widow, too, and that she had been cheated out of some property which, while it didn't just leave them poverty-stricken, they had to do without quite a few of the luxuries that they had been able to have before. . . . Q. Now, did you sign certain papers on that occasion? A. Yes, I signed four or five papers there.

Q. And did Mr. Noble show you where you were to sign those papers? A. Yes." Noble told her Rogers would make an application for the loan on her property. He did not tell her Rogers would take the title in his name for her. Plaintiff signed a "Statement of Information" and three applications for loans on real estate, all dated January 19, 1957. At the time plaintiff signed them they were one above the other and in between them there was a grant deed conveying Lots 60 and 61 from plaintiff to Rogers. In signing the statement and the loan applications plaintiff unknowingly also signed the grant deed. She did not read any of the papers. The deed also bears the signature of Gersha Rogers, wife of Rogers, and recites she joined in its execution for the purpose of vesting title in Rogers as his separate property. It was signed by Gersha Rogers without the knowledge of plaintiff. The deed bears the date January 19, 1957, an acknowledgment of the sub-scriptions of plaintiff and Gersha Rogers before Noble as a notary public, and a notarial certificate. Noble was not a notary at the time. It was stipulated the deed conveyed the legal title to Lots 60 and 61 to Rogers. Plaintiff testified further: "Q. So far as you know, on that date or any other date, did you ever sign a grant deed to your property? A. No, I did not. Q. Did you intend on that date or any other date to sign a grant deed to your property? A. No, I did not. Q. Were you willing to sign a grant deed to your property on that date or any other date? A. No, I was not."

The deed of January 19, 1957, from plaintiff to Rogers was recorded at the request of Majestic Homes on April 8, 1957.

On April 23, 1957, Rogers executed a note for $7,200 payable to Canoga Park Savings and Loan Association and a deed of trust securing it covering Lot 60. The same day he executed a second note for $7,300 payable to Canoga and a deed of trust securing it covering Lot 61. On May 6, 1957, Freedman requested a conveyance of the deed of trust exe-cuted by plaintiff on May 25, 1956, and the trustee reconveyed. On May 7, 1957, Rogers executed a third note for $4,950 payable to Freedman and a deed of trust securing it covering Lots 60 and 61. This deed of trust recited it was subject to those to Canoga. The deeds of trust in favor of Canoga and Freedman were purportedly acknowledged by Rogers before Noble as a notary public at a time when Noble was not a notary. They were recorded May 14, 1957. On May 14, 1957, in an escrow with Consolidated Escrow Company through which Rogers obtained the loan from Canoga, he paid the

Orange and Gubiotti deeds of trust in full ($1,359.25 and $5,176.73) and paid Freedman $5,932.38, principal and interest. From June 14, 1957, to and including November 15, 1957, Warrog paid Freedman $360 in installments of $60. Five of the checks were signed by Warnick; one, by Rogers. On June 24 and July 25, 1957, Warrog paid Canoga a total of $258 by checks signed by Warnick.

In late April or early May 1957 plaintiff learned she had conveyed the property when her fire insurance agent asked her if she had sold her home. Apparently she then consulted a lawyer and proceeded as he advised.

In May 1957 plaintiff telephoned the office of Majestic Homes and asked for Warnick. She was told Warnick was too busy to see her. Plaintiff and James Elam, a friend, then went to Majestic's office and saw Rogers. Plaintiff testified: "Q. . . . What was said by each of you, as nearly as you can recall, in that conversation? A. I said to Mr. Rogers that I wanted to see Mr. Warnick but he is busy, so Mr. Rogers said that he could help me. He said he knew, he was familiar with the details and he could tell me about it. I said, 'Well, someone in this office claims that I have deeded my property away.' . . . Mr. Rogers replied yes, I had, that I had signed my property—deeded it over to him. And I told him no, that I hadn't. And he said, 'Oh, yes, you did, Mrs. Wright.' He said, 'You had not been making your payments. Therefore I had to take the property over.' I replied that I had been making my payments, that I had been making my payments all along to Orange Building & Loan and to the Gubiottis, and I had never stopped. So he said, oh, well, I don't know. He said, 'You will have to see Mr. Alan Noble about it.' Then— . . . A. Mr. Alan—Mr. Joseph Noble about it. So he telephoned Mr. Noble. Mr. Noble began talking to me on the phone. I told Mr. Noble that I was too upset and couldn't understand what he was saying, would he please speak to Mr. Elam, which he did, and Mr. Elam couldn't understand too well, so we said we would go over to Mr. Noble's office. So we went directly over to Mr. Noble's office. Q. All right. When you got there did you see Mr. Noble? A. Yes, we did. Q. And you had a conversation with him? A. Yes, I did. Q. And who was present at that conversation? A. Mr. Noble was there. Q. Will you please tell us what was said in that conversation? A. I gave him some statement sheets in an envelope that Mr. Rogers had given me to give to Mr. Noble. . . . A. And I asked him about what had happened, why did he say that I

had signed my property over to Mr. Rogers when I knew that I hadn't. Mr. Noble said that I had signed my property over to him, that I couldn't get the credit, and he had to have a cosigner, and that Mr. Rogers had agreed to stand for it, and that was why the property was in Mr. Rogers' name. And then Mr. Elam asked about the statement sheets and the papers. We wanted to see and get as much as it was possible so we could understand what was going on, but Mr. Noble said the papers weren't ready, that he would have them ready in a day or so."

The next day plaintiff and Mr. Elam again went to see Rogers. Plaintiff asked Rogers if he would deed the property back to her and make the payments less. Rogers said: "he didn't want it, and he says no, he couldn't do that." Rogers then told them he would have a paper drawn showing that plaintiff "would be in complete possession" of her property, all she had to do was make the payments. Rogers telephoned Noble and asked him "to draw up this paper." Plaintiff and Mr. Elam then went to Noble's office. Noble told them he would draw the paper, to come back the next day and it would be ready.

Plaintiff and Mr. Elam returned to Noble's office the next day. Noble gave them a document captioned "Lease Form." This instrument, dated May 18, 1957, was between Rogers as lessor and plaintiff as lessee; it leased Lots 60 and 61 to plaintiff for 36 months commencing May 15, 1957, at a monthly rental of $189 commencing June 15; and provided that if the rent was not paid Rogers could reenter and all rights of plaintiff would cease. The instrument provided that should plaintiff desire to purchase the property during faithful performance of the lease Rogers would sell it to her for $19,450, subject to the amounts then unpaid on the Canoga and Freedman deeds of trust. Plaintiff and Mr. Elam then went to Rogers' office. Plaintiff handed Rogers the document and asked him to sign it. Rogers telephoned Noble and asked if he should sign; Noble said "yes"; Rogers signed and gave it back to plaintiff. Rogers gave plaintiff a check of Consolidated Escrow Company for $65.10 payable to Rogers, endorsed by him, stating "it was the money left over." Rogers told plaintiff to start making her payments with the check. Plaintiff told Rogers she could not start making payments on something that was not hers. The "Lease Form" was not signed by plaintiff. If plaintiff had signed this "Lease Form"

and had exercised the option, she would have paid the purchase price of $19,450 and taken the property subject to the amounts then unpaid on the Canoga and Freedman deeds of trust executed by Rogers.

At the taking of plaintiff's deposition, counsel for Rogers tendered plaintiff a grant deed to Lots 60 and 61 subject to "Trust Deeds of Record." The tender was rejected. If plaintiff had accepted the deed, she would have taken title subject to the Canoga and Freedman deeds of trust.

The court found: until about May 14, 1957, Lots 60 and 61 were encumbered by two deeds of trust, one in favor of Orange Savings and Loan Association, the other in favor of Gubiotti; these deeds of trust were never in default at any time; the representations made to plaintiff by Noble, Rogers, and Warnick were material, false and fraudulently made, known by them to be false and fraudulent, made with intent to induce plaintiff to enter into the transaction and to execute any and all documents presented to her by them for the purpose of cheating her of her realty; plaintiff relied solely and in good faith on the statements and representations, believed them to be true, and acted on them until she discovered their falsity; in reliance on the representations, plaintiff signed all documents presented to her by them for her signature.

The court further found: Rogers, Noble, and Warnick "intended to procure and induce plaintiff, by artifice, trick and device, and did procure and induce her by artifice, trick and device, to sign" the grant deed to Rogers; the "artifice, trick and device was accomplished by Noble by means of manipulating and shuffling a sheaf of papers which were presented to plaintiff by him in such a manner that plaintiff unknowingly placed her signature on said grant deed, believing said document to be an entirely different instrument; said deed was without consideration to plaintiff and is and was void from the date and inception thereof; said deed was maliciously caused to be recorded by Warrog, Majestic, Rogers, Warnick, Olympia and Noble"; the three deeds of trust executed by Rogers were, and are, void; title to Lots 60 and 61 remains in plaintiff; Canoga and Freedman are not, and never have been, innocent encumbrancers for value.

The court also found: by reason of the fraud and as a proximate result thereof plaintiff has been injured by Rogers; Noble; Warrog; Majestic Homes, a partnership; and Olympia in the sum of $2,000 compensatory damages and she is en-

titled to an additional sum of $2,000 "for the sake of example and by way of punishment against said defendants."

Additional findings were: on October 12, 1956, Fannie Freedman paid Warrog $8,515.80 for its assignment bearing that date to her of the note and deed of trust for $9,462 dated May 26, 1956, with interest at 7.2 per cent executed by plaintiff granting Lots 60 and 61 in trust as security for the payment of the note; plaintiff executed the note and deed of trust in reliance on the false and fraudulent statements made to her as previously found; on May 14, 1957, Freedman was paid $5,932.38 on account of the note from "the proceeds of said trust deed loans wherein Canoga is the beneficiary"; the net amount expended by Freedman is $2,583.42—$8,515.80 minus $5,932.38; Freedman requested full reconveyance of the deed of trust of May 26, 1956, and the trustee thereupon reconveyed Lots 60 and 61; on May 14, 1957, Canoga expended $12,041.25 and has been paid interest to July 25, 1957, on the deeds of trust in which it is the beneficiary.

The court concluded: (1) the grant deed from plaintiff to Rogers and the deeds of trust wherein Canoga and Freedman are beneficiaries are, and have been since the inception of each of them, null and void; (2) plaintiff is entitled to a decree that she is the owner of Lots 60 and 61 and quieting her title thereto subject to specified equitable liens; (3) Canoga is entitled to an equitable lien in the sum of $6,020.60 on each of Lots 60 and 61, together with interest thereon from July 25, 1957, at 6.6 per cent on the unpaid balance, payable $62.50 a month, interest included; (4) subject and subordinate to the equitable liens of Canoga, Freedman is entitled to an equitable lien in the sum of $1,470.60 on each of Lots 60 and 61, together with interest from May 14, 1957, at 7.2 per cent on the unpaid balance, payable $22.50 a month, interest included; (5) plaintiff is entitled to judgment for the damages found. Judgment was rendered accordingly.

All defendants except Majestic Homes, a partnership, Canoga, and Title Insurance and Trust Company have appealed. The appealing defendants will be referred to as defendants. Defendants concede that the part of the judgment quieting plaintiff's title in Lots 60 and 61 subject to the equitable liens of Canoga and an equitable lien in favor of Freedman should be affirmed.

The cause went to trial on the third amended complaint. Defendants' first contention is that the judgment should be reversed because there are inconsistencies between

the allegations of the third amended complaint and the allegations of the prior complaints. The point is untenable. We need not state the argument in this respect because it runs counter to the principle contained in the Code of Civil Procedure, section 469 et seq., which liberally permits amendments. The third amended complaint furnished the sole basis of the cause of action and the former ones ceased to have any effect as pleadings or as a basis for judgment. The prior pleadings cannot be looked to for the issues tried. "It is well established that an amendatory pleading supersedes the original one, which ceases to perform any function as a pleading. . . . It is generally recognized, however, that a superseded pleading may be given some evidentiary effect, although the courts are not in accord as to the circumstances under which it may be considered. (See 4 Wigmore on Evidence (3d ed. 1940) 61, § 1067.) By a long line of decisions, it is established in this state that such a pleading is not admissible as direct evidence to establish a fact in issue [Citations.] The reason for this view is that the use of superseded pleadings to such extent as to embarrass the amending party is in derogation of the policy of liberality in permitting amendments to pleadings. [Citations.] However, where the party has testified in the action, a superseded pleading may be offered for the purpose of impeachment." (*Meyer* v. *State Board of Equalization*, 42 Cal.2d 376, 384-385 [267 P.2d 257].) The record shows that the claimed inconsistencies were used by defendants in an attempt to impeach plaintiff. Assuming possible inconsistencies in the complaints, they form no basis for reversal of the judgment.

 The next specification of error is that there is "a total lack" of evidence to support the findings. The claim is obviously without merit. Defendants say "the oral testimony of the plaintiff on these issues lacks *legal* verity and it cannot be legally relied upon in support of the decree against the defendants-appellants." They argue that the findings are based on plaintiff's "unrealistic oral story," on "evanescent inferences," and that the evidence of fraud and forgery was not clear or convincing. The expression sometimes found in the decisions to the effect that fraud is to be established by "clear and convincing evidence" states nothing more than a rule of evidence directed to the trial court; and if that court finds that fraud is established by a preponderance of the evidence, a reviewing court must accept that determination as

362

conclusive if there is substantial evidence to support it. (*Baines* v. *Zwieback,* 84 Cal.App.2d 483, 487-489 [191 P.2d 67]; *Chung* v. *Johnston,* 128 Cal.App.2d 157, 164 [274 P.2d 922].) The testimony and exhibits fully support the findings.

In April 1956 plaintiff was the owner of Lots 60 and 61. The lots were encumbered by deeds of trust: one to Orange Savings and Loan Association, and one to Gubiotti. The total amount unpaid on the encumbrances was about $7,070.35. Plaintiff was then, and at all times has remained, in open possession of the property. Anthony and Warnick, agents of Warrog, repeatedly assuring plaintiff of their honesty and experience, persuaded her to buy a house, to have it moved to vacant Lot 60, and to execute another deed of trust of $9,462 covering both lots in favor of Warrog. In October 1956 Rogers sold this deed of trust to Freedman for $8,515.80. The obligation on this deed of trust was due December 1, 1956. Rogers did not pay Orange or Gubiotti with this money. The Tarzana house was moved onto Lot 60 in November 1956. It was not ready for occupancy until January 1957. In the meantime Warnick repeatedly told plaintiff not to worry about paying Majestic (the note to Warrog), to keep paying on the Orange and Gubiotti encumbrances; and assured her the property would be refinanced "100 per cent."

In January 1957, when the house was ready for occupancy, Warnick sent plaintiff to Olympia to see Noble to apply for a loan for refinancing. Noble, by working a "document switch," caused her to sign the grant deed conveying her property to Rogers. The procuring of plaintiff's signature to the grant deed by fraudulent representations and trick and device constituted a forgery. Where a person who has no intention of selling his property is induced by some trick or device to sign a paper having such effect, believing that paper to be a substantially different instrument, the paper so signed is a forgery. (*People* v. *Nesseth,* 127 Cal.App.2d 712, 718-720 [274 P.2d 479].) Noble, without a notary's commission, acknowledged plaintiff's signature without telling her he was doing so. The grant deed was not recorded until some three months later. Rogers then executed two deeds of trust to Canoga covering Lots 60 and 61, totaling $14,500. With the proceeds of this loan he paid the original encumbrances to Orange and Gubiotti and paid $5,932.38 to Freedman, leaving a balance on that encumbrance of $4,190. Rogers and Freedman then shifted this $4,190 to a new deed of trust for $4,950 in favor of Freedman.

At the time Rogers obtained the loan from Canoga the encumbrances on Lots 60 and 61 in favor of Orange and Gubiotti amounted to about $6,487.93 and the encumbrance in favor of Warrog which it had assigned to Freedman amounted to $9,462, a total of about $15,949.93. After Rogers had fraudulently obtained the grant deed from plaintiff and obtained the loans from Canoga, the encumbrances totaled $19,450. The result of the manipulations of Rogers, Noble, and Warnick was that plaintiff no longer owned the property; Rogers was the record owner through a forged deed; the unimproved lot was now improved; and there were deeds of trust against both lots in the amount of some $19,450. A reasonable inference from the evidence is that, without the fraud, plaintiff on May 14, 1957, would have been the owner of the property; the unimproved lot would have been improved; and both lots would have been encumbered by total loans of about $14,179.93.

Over the objection of defendant Noble, the court permitted plaintiff to prove by a record of the real estate commissioner that about October 1, 1954, Noble had forged three promissory notes and three deeds of trust securing them, and by fraud had sold them to an innocent purchaser, and that in the proceeding before the commissioner Noble had admitted the facts. Defendants assert prejudicial error. There was no error. "Cases of fraud are exceptions to the general rule that other offenses of the accused are not relevant to establish the main charge. Where fraud is charged, evidence of other frauds or fraudulent representations of like character, committed by the same parties at or near the same time is admissible to prove intent." (*Atkins Corp.* v. *Tourny*, 6 Cal. 2d 206, 215 [57 P.2d 480]; *Janisse* v. *Winston Inv. Co.*, 154 Cal.App.2d 580, 588 [317 P.2d 48].)

Defendant Freedman attacks the trial court's computation of the equitable lien awarded her. The court's computation and that claimed by Freedman are set out in the margin.[1]

---

[1]The court computed the amount of Freedman's equitable lien as follows:

October 12, 1956—paid by Freedman to Warrog, Inc., doing business as Majestic Homes as beneficiary for assignment to her of deed of trust in the amount of $9,462, dated May 25, 1956, executed by plaintiff . . . . . $ 8,515.80

May 14, 1957—received by Freedman from Rogers through deed of trust loans from Canoga in payment of above deed of trust assigned to her (plus a junior deed of trust of same

The court computed the lien by taking the amount Freedman paid for the deed of trust. It awarded her interest from October 13, 1956, only. Freedman states the court should have taken the face amount of the note secured by the deed of trust and should also have given her interest from May 25, 1956. On May 14, 1957, no part of the principal of, and no part of the interest on, the note of May 25, 1956, for $9,462 owned by Freedman and secured by the deed of trust, had been paid. The interest rate was 7.2 per cent. On May 14, 1957, accrued interest was $660.38. Thus, $10,122.38 was owing to Freedman. On May 14 she received $5,932.38 from Rogers, leaving a balance of $4,190 owing to her. There was no evidence that Freedman was a party to the fraud or the forgery. The assignment of the $9,462 note and trust deed to her was not attacked. As stated by the trial court in its memorandum opinion, it "constituted a valid claim upon plaintiff for the full amount thereof." The court in its memorandum computed the equitable lien as follows:

"Principal on May 25, 1956 ............... $ 9,462.00
Interest at 7.2% from May 25, 1956 to May
 14, 1957 ........................... 660.38

Total owing on May 14, 1957 ............. 10,122.38
Less credit by payment from Canoga Park
 Savings and Loan Association .......... 5,932.38

Balance of principal owing Fannie Freed-
 man on May 14, 1957 .................. $ 4,190.00"

We think this is the correct computation. The fact that Freedman purchased the note and deed of trust at a discount

date executed by Rogers in the sum of $4,950) ........... $ 5,932.38

 $ 2,583.42
Interest at 7.2 per cent from October 13, 1956 to May 14,
1957 on $8,515.80 .................................... 357.77

Freedman equitable lien (½ against each lot) ............ $ 2,941.19

Freedman contends the amount of her equitable lien should have been computed as follows:
Original principal of May 25, 1956, deed of trust described
above ........................................... .......... $ 9,462.00
Interest at 7.2 per cent from May 25, 1956 to May 14, 1957. 660.38

 $10,122.38
Received on account from Rogers ...................... 5,932.38

Balance due May 14, 1957 plus interest at 7.2 per cent from
May 14, 1957 ........................................ $ 4,190.00

did not reduce plaintiff's obligation to her. We see no reason, and none is suggested, why her equitable lien should not be for $4,190 plus interest at 7.2 per cent per annum from May 14, 1957, less the $360 she received from Warrog between June 14 and November 15, 1957. This is the only relief defendant Freedman seeks. She does not complain that her lien is made subordinate to Canoga's lien.

▮ Defendants attack the findings of damages on the ground they are without evidentiary support. The point has no merit. This is a case of fraud, forgery, and disparagement of title by the recording of the grant deed and the deeds of trust to Canoga and Freedman. "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Civ. Code, § 1709.) The measure of damages "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333; *Gudger* v. *Manton*, 21 Cal.2d 537, 555 [134 P.2d 217].) ▮ For a tortious act damages will be awarded to the extent that the injured party will be restored to the position he would have occupied had the tort not occurred. (*Alphonzo E. Bell Corp.* v. *Listle*, 74 Cal. App.2d 638, 650 [169 P.2d 462].) ▮ A party may recover consequential damages resulting from his acts in reliance on the other party's misrepresentations. (*Gagne* v. *Bertran*, 43 Cal.2d 481, 490 [275 P.2d 15] ; 9 Cal.Jur.2d 635, § 48.)

▮ Plaintiff is damaged in the difference between the amount of the valid liens that were on Lots 60 and 61 prior to the forgery and the amount of the equitable liens. The court found that defendants fraudulently represented to plaintiff that the total cost to be paid by her for the Tarzana house, moving, and relocating it onto Lot 60 would be $7,500, and the funds to pay the same could and would be obtained by increasing the existing liens on plaintiff's property in that amount; that plaintiff would continue to be the owner of Lots 60 and 61, and would become the owner of the Tarzana house subject to a new encumbrance in an amount sufficient to pay and discharge the existing encumbrances and the cost of the Tarzana house. The court further found that plaintiff executed the $9,462 note to Warrog in reliance on the false and fraudulent statements made to her by Anthony and Warnick. At the time Rogers obtained the loans from Canoga the encumbrances on Lots 60 and 61 in favor of Orange and Gubiotti amounted to about $6,487.93, and the falsely represented cost

of the house, moving, and relocating it was $7,500, a total of about $13,987.93. After Rogers had obtained the grant deed from plaintiff by fraud and forgery and had obtained the loans from Canoga, the encumbrances totaled $19,450. The court reduced the Canoga encumbrances to equitable liens totaling $12,041.20. We have held that the Freedman equitable lien should be $4,190. Thus the total of the equitable liens is $16,231.20. The difference between the liens of $13,-987.93 at the time the grant deed was obtained and $16,231.20, the amount of the equitable liens, is $2,243.27.

The law is well settled that the act of wrongfully filing for record an unfounded claim to the property of another is actionable. (*Fearon* v. *Fodera*, 169 Cal. 370, 379 [148 P. 200, Ann.Cas 1916D 312] ; *Coley* v. *Hecker*, 206 Cal. 22, 27 [272 P. 1045] ; *Gudger* v. *Manton*, 21 Cal.2d 537, 541-543 [134 P.2d 217] ; *Ezmirlian* v. *Otto*, 139 Cal.App. 486 [34 P.2d 774] ; *Davis* v. *Wood*, 61 Cal.App.2d 788 [143 P.2d 740] ; *Kalajian* v. *Nash*, 148 Cal.App.2d 495 [306 P.2d 921] ; Rest., Torts, § 624; Prosser on Torts, 2d ed., 760, § 108.) [15] In an action for disparagement of title the plaintiff may recover as damages the expense of legal proceedings necessary to remove a cloud on the plaintiff's title. (Prosser on Torts, 2d ed., 766, § 108. *Cf. Reachi* v. *National Auto. & Cas. Ins. Co.*, 37 Cal.2d 808, 812-813 [236 P.2d 151].) The Restatement says the publisher of disparaging matter is liable for "the expense of litigation reasonably necessary to remove the doubt cast by the disparagement upon the other's property in the thing or upon the quality thereof." (Rest., Torts, § 633(b).) *Broadway Fed. etc. Loan Assn.* v. *Howard*, 133 Cal.App.2d 382 [285 P.2d 61], says one of the elements of damage is "the cost of clearing title from the disparaging claim." Holding that a cause of action was stated by allegations that the defendant maliciously filed of record an abstract of judgment purporting to constitute a lien against the plaintiff's real estate at a time when the defendant knew the judgment had been suspended by an appeal bond, the court, in *Coley* v. *Hecker*, 206 Cal. 22 [272 P. 1045], said that the allegation that the malicious recordation decreased the value of the real estate and rendered it less marketable was obviously true, and that it was not necessary that the plaintiff show the wrongful act interfered with some specific opportunity to sell or deal with the land, as might be true if the utterance complained of were oral. It has been held that in an action for disparagement of title, damages may be awarded for the inconvenience

and time suffered by the plaintiff in the removal of a recorded cloud on his title. (*Frega* v. *Northern New Jersey Mtg. Assn.*, 51 N.J. Super. 331 [143 A.2d 885, 890].) There is no express testimony of the amount of damage as a result of these matters, but their character is such that the trial judge could call on his general knowledge of their amount. (See *Estate of Reinhertz*, 82 Cal.App.2d 156, 160 [185 P.2d 858, 186 P.2d 755] ; *Merrill* v. *Dustman*, 97 Cal.App.2d 473, 477 [217 P.2d 998] ; *Johnson* v. *Snyder*, 99 Cal.App.2d 86, 90 [221 P.2d 164].) ▮▮▮ ''One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness.'' (*Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297-298 [149 P.2d 177] ; *Smith* v. *Mendonsa*, 108 Cal.App.2d 540, 542-545 [238 P.2d 1039].) ▮▮▮ The record fully supports the finding as to compensatory damages.

With respect to damages the complaint prayed for judgment ''Against all defendants, except Title Insurance and Trust Company, Canoga Park Savings and Loan Association and Consolidated Escrow Company, in the event said grant deed and deeds of trust are not cancelled and decreed to be void and of no effect, actual damages in the sum of $11,000.00 and punitive damages in the sum of $10,000.00.'' There was also a prayer for general relief; but there was no other specific prayer for damages. Defendants assert that in view of the quoted prayer it was error to award plaintiff damages. The point is without merit.

''The relief granted to the plaintiff, if there be no answer, cannot exceed that which he shall have demanded in his complaint; but in any other case, the court may grant him any relief consistent with the case made by the complaint and embraced within the issue.'' (Code Civ. Proc., § 580.) ▮▮▮ The court in a cancellation action may grant any relief consistent with the case made by the complaint and embraced within the issues although not specifically prayed for. And the court may grant any monetary relief necessary to do complete equity between the parties. (9 Cal.Jur.2d 633, § 48.) Thus, when an answer is filed, the case becomes one in which the court is authorized regardless of the prayer to grant any relief consistent with the plaintiff's averments. ▮▮▮ The jurisdiction of the court to grant any particular relief depends not on the prayer but on the issues—that is, on the scope of the complaint and the issues made or which might have been made under it—and any relief consistent with the issues raised may

be granted regardless of the prayer. (*Nathan* v. *Dierssen*, 164 Cal. 607, 611 [130 P. 12]; *Johnson* v. *Polhemus*, 99 Cal. 240, 244-245 [33 P. 908]; *De Leonis* v. *Hammel*, 1 Cal.App. 390, 393-394 [82 P. 349]; *Murphy* v. *Stelling*, 8 Cal.App. 702, 707 [97 P. 672]; *Pedro* v. *Soares*, 18 Cal.App.2d 600, 606 [64 P.2d 776].)

Section 3294 of the Civil Code authorizes exemplary damages "in an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice. . . ." "Courts award exemplary damages to discourage oppression, fraud or malice by punishing the wrongdoer. [Citations.] Such damages are appropriate in cases like the present one, where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained. (*Ward* v. *Taggart*, 51 Cal.2d 736, 742-743 [336 P.2d 534].) The record discloses no abuse of discretion in the award of exemplary damages.

Defendant Consolidated Escrow Company was the trustee named in the deeds of trust executed by Rogers to secure the Canoga loans. Damages were not awarded against it. Since it is conceded the judgment quieting title in plaintiff subject to the equitable liens should be affirmed, Consolidated has no ground of appeal. The only participation of defendant Gersha Rogers in the transaction was that she joined in the deed to Alan Rogers, her husband, for the purpose of vesting title in him as his separate property. Damages were not awarded against her. She has no ground of appeal.

In defendants' closing brief, it is claimed for the first time that Majestic Homes, a partnership, was not named as a defendant and consequently that the court erroneously awarded damages against it. Since Majestic Homes, a partnership, did not appeal, we do not decide the point.

The judgment is modified by striking from paragraphs (6) (c) and (6) (d) the figures and words "$1470.60, with interest thereon from May 14, 1957, at 7.2% per annum on the unpaid balance," and inserting in lieu thereof in each of said paragraphs the following: $2095, with interest thereon from May 14, 1957, at 7.2 per cent per annum on the unpaid balance less the sum of $180"; as thus modified, it is affirmed. Plaintiff shall recover her costs of appeal from defendants other than Fannie Freedman. Costs are not awarded Fannie Freedman since they are *de minimis.*

Shinn, P. J., and Wood (Parker), J., concurred.