[Civ. No. 28623. First Dist., Div. One. May 18, 1972.]

RHEBA FORTE et al., Plaintiffs and Respondents, v.
ADRIAN NOLFI et al., Defendants and Appellants.

658

**COUNSEL**

James J. Duryea, Michael Lewton and John A. McGuinn for Plaintiffs and Respondents.

Walcom & Harmon, Leo J. Walcom and Henry Gross for Defendants and Appellants.

## OPINION

**SIMS, J.**—Defendant Nolfi, and defendants Williams and Belli, individually doing business as the Wellbell Company, and the Keith Company, a co-partnership consisting of Julian S. Davis and Audrey S. Davis, have separately appealed[1] from a judgment which adjudged that a note and deed of trust allegedly executed by plaintiffs was null and void and of no legal effect and created no lien upon the property of plaintiffs, quieted plaintiffs' title as against said defendants, and awarded plaintiffs, as against all the defendants, jointly and severally, $17,900 damages, representing an award of $20,000 as the proximate result of the false, fraudulent, oppressive and malicious acts of the defendants, and each of them, less a credit of $2,100 which was found to be the reasonable value of the repairs actually performed by the defendant Nolfi.

The defendants contend that there is no evidence or testimony of any kind to support material findings of fact made by the trial court and the judgment predicated upon those findings. The defendants Williams et al., who may be collectively referred to as the financiers, specifically attack the findings that the plaintiffs signed the note and deed of trust without knowledge of the nature and legal significance of the documents (VIII), that all of the defendants conspired to falsely and fraudulently obtain plaintiffs' signatures on the note and deed of trust, and to assign the same for the purpose of depriving plaintiffs of any defenses they might be able to assert against defendant Nolfi, the original payee of the note (XIII), and that the plaintiffs were damaged in the sum of $20,000 (XVIII). Defendant Nolfi, the contractor, in a rambling brief apparently makes the same contentions and in addition complains of the failure of the court to find whether the original agreement for the work, which was allegedly financed by the note and deed of trust, was for a price of $2,700, inclusive or exclusive of financing charges, and of the sufficiency of a finding, related to finding VIII, above, to the effect that plaintiffs would not have signed the instruments had they known their true nature (X).

It is concluded the evidence is sufficient to sustain the finding that the defendant Nolfi secured the signatures of plaintiffs to the note and deed of

---

[1]Each notice of appeal refers to an original judgment entered February 27, 1970, and to a corrected judgment entered March 10, 1970. The latter was signed and entered to correct a reference to the book in which the deed of trust involved was recorded. (See Code Civ. Proc., § 473; and *Meyer* v. *Porath* (1952) 113 Cal.App.2d 808, 811 [248 P.2d 984].) In the absence of intervening rights it is unnecessary to determine whether it would have been more appropriate to amend the earlier judgment *nunc pro tunc*. It is deemed superseded by the corrected judgment, and any appeal from the earlier judgment is dismissed as superfluous.

trust by falsely and fraudulently concealing from and misrepresenting to plaintiffs the nature and legal significance of the documents; that the evidence fails to support the finding that the remaining defendants conspired with Nolfi to that end, although they did conspire with him to secure usurious compensation for the loan; that the evidence sustains the finding that the reasonable value of the work performed was $2,100 rather than the $2,700 contract price; that the damages properly assessed against Nolfi and improperly assessed against the remaining defendants for slander of title are excessive; and that in order to equitably dispose of the matter, the plaintiffs should be required to pay the value of the work accomplished, without interest, to the usurious lender in order to quiet the equitable lien created by the construction contract which plaintiffs acknowledgedly executed. The judgment must be reversed and the case must be remanded for further proceedings.

In December 1961 the property at 456 Silver Avenue in San Francisco was owned by plaintiffs Rheba Forte and Callie Holt in joint tenancy. It was encumbered by a deed of trust securing an indebtedness of $10,000, incurred when the property was in the sole name of plaintiff Forte so that she could make a down payment on the home in which she resided at the time of the events giving rise to this action. The plaintiff Holt is the aged and infirm mother of plaintiff Forte and took no part in the transactions except, as related by her daughter, to sign the proposal for work submitted by defendant Nolfi. Reference to plaintiff in the singular is to plaintiff Forte, who married Charles Hightower December 2, 1961, but used the name Forte in signing the proposal and in bringing this action because the property was of record in that name.

Plaintiff concededly had received notices from the urban redevelopment authority of the City and County of San Francisco listing numerous violations of the various housing, electrical, plumbing and building codes. The building inspector put a sticker on the front of the building which stated that the property was uninhabitable, and subsequently in 1965 the city filed suit against the owners. The problem giving rise to the work involved in this case arose by virtue of the fact that heavy rains in the winter of 1961-1962 caused a failure of the retaining wall and foundations at the southwest portion of the property. The city had at that time condemned the basement apartment. Plaintiff's husband contemplated doing the repair work himself, he purchased some materials and he submitted plans to the city but the authorities told him he would have to get an architect's plans. Although the plaintiffs never sought to get credit to effect the repairs, Hightower, at the request of a contractor, attempted to secure financing at a branch of the Bank of America and was unsuccessful.

Both Hightower and Nolfi agree that they met at the premises in December 1961, that plans were drawn for the work by an architect, that Nolfi gave an estimate of $2,700 for doing the work, and that the negotiations terminated with plaintiffs' signing of the contractor's proposal. According to Hightower, two meetings occurred when the contractor came by the premises while he was cleaning up debris from the collapse of the wall, and the plans for the work, which bear date of March 13, 1962, were prepared by the architect at his request. The contractor testified that he came to the premises as a result of a phone call received from Hightower and that he arranged for and paid for the architect's plans. He acknowledged that his practice was to advise the owner that plans were necessary and have the owner bear the cost.

Hightower, plaintiffs and Nolfi were present at the Hightowers' residence when the proposal submitted by Nolfi, and dated March 9, 1962, was signed by the plaintiffs. The evidence concerning the manner in which the plaintiffs' signatures were apparently affixed to the note in the sum of $3,450, and the deed of trust securing it, which are the subject of this action, is discussed below.

A typewritten promissory note dated March 6, 1962 ostensibly executed by plaintiffs with Nolfi as payee in the sum of $3,450 payable, with interest at 10 percent per annum in instalments of $40 per month, and secured by a deed of trust bearing the same date, ostensibly executed by the plaintiffs with Nolfi as the beneficiary, and Willbell Company, a partnership, as trustee were obtained by Nolfi. The deed of trust, and an assignment of the deed of trust dated March 12, 1962 from Nolfi to the Keith Company, a partnership, each bear acknowledgments executed by the same notary on March 16, 1962. On that date defendant Belli deposited $2,700 with a title company on behalf of the Keith Company, a partnership, the deed of trust and assignment were recorded, and the $2,700 was disbursed as follows: for title insurance $45, recording fee $4.80, and notary fees of $3, leaving a balance of $2,647.20 which was paid to Nolfi.

Further evidence bearing on the part played by the defendant financiers in the foregoing transactions is reviewed under the discussion of the finding on conspiracy, and the evidence bearing on the performance of the work then undertaken by defendant contractor is discussed in connection with the finding on damages.

Defendant Williams testified that on March 20, 1962 he wrote a letter to plaintiffs at the Silver Avenue address transmitting a payment book of a type issued by the title company which handled the above transaction, and that such books as he sent customarily bore a sticker setting forth his

name and address which obliterated similar information relating to the title company. Defendant Nolfi had never seen the payment book. Defendant Belli was familiar with the fact that the title company gave the payment book to brokers, but stated that Williams handled all collections through his office, and he did not know whether or not one had been sent to plaintiffs.

The book bears a sticker with the names of plaintiffs and the Silver Avenue address, but no sticker obliterating the title company's name and address. Its cover refers to a note dated "3/6/62" in the amount of "$3450.00" for a term of "3 yrs." with interest at "10%" calling for monthly payments of "$40.00." The inside indicates that the note was due "4-1-65" and again shows the principal amount, the note of interest and the amount of monthly payments. It reflects a payment of $80 under date of August 29, 1962. Of this sum $57.50 was credited to the payment of interest through May 6, 1962, $8 to "L.C." (late charge?), and $14.50 on account of interest due to June 6, 1962.

Plaintiff acknowledged that she received the payment book which was produced in court. She stated that her husband had found it in the mailbox at 456 Silver Avenue. Although she first affirmed that it had been received in the mail, subsequently she testified that it had been just dropped in the box without letter or envelope. She specifically denied receiving the original of the letter which Williams testified was mailed with the book, and that his sticker was on the book when she got it. She testified that when she received the book she immediately went to the title company to inquire what it meant because she could not understand why the principal amount of the loan was over $3,000, or why the interest rate was 10 percent. At the title company an employee took the book away and on returning it advised her that they had no record or knowledge of the transaction. Plaintiff denied that she or her mother ever made any payment on account.

In the demand to the title company at the time the assignment was recorded, Belli had requested "Memo of Ins." Williams testified that he received the note, the deed of trust, the assignment, a policy of title insurance, and a memorandum of insurance which consisted of a copy of a fire insurance policy with an endorsement showing the Keith Company, a partnership, as having an interest in the property. He produced a policy covering the period from "1/31/68" to "1/31/71" which showed under "Mortgage Clause," "2nd. The Keith Company, a partnership, c/o B. Belli," followed by Belli's address. Plaintiff acknowledged that she might have received a notice from her insurance broker around March 16, 1962 indicating that an endorsement had been made to her policy covering the Keith Company,

but she could not remember or say whether she had received it. She acknowledged that the then current policy named Keith Company in the mortgage clause and that the person whose sticker was on the policy was her insurance broker.

According to plaintiff the first time she knew a note and deed of trust had been signed and recorded in connection with the construction contract was when she was so advised in a telephone call from a deputy district attorney who was apparently investigating the contractor. A notice of default was recorded March 4, 1963. On March 6, 1963, Hightower signed for a letter enclosing a copy of the notice of default which had been sent to plaintiffs at the Silver Avenue address by registered mail. Plaintiff acknowledged receiving this letter from her husband. She thought she received the notice of default after she received the payment book, but was not sure whether the receipt of the notice preceded or was subsequent to the call from the deputy district attorney. Plaintiff on April 6, 1963 wrote the attorney for the financiers, after consulting her attorney and making a copy of the letter for him. She requested advice as to the amount owed, and offered to pay it in three instalments. On April 29, 1963 defendant Williams advised her of the amount claimed to be due. Plaintiff never notified either the attorney or Williams that she had never paid the $80, as reflected in the payment book and acknowledged in Williams' letter, or that the signatures on the note and deed of trust were not authentic.

On June 3, 1963, the present action was filed against the contractor, the financiers, and the notary who had acknowledged the signatures on the deed of trust and the assignment. The first cause of action sets forth the respective claims of the defendants, other than the notary, under the note and the recorded deed of trust and assignment. It is further alleged, "Commencing on or about March 9, 1962, up to and including the present time, defendants, and each of them, have wrongfully and unlawfully forged the signatures of RHEBA FORTE and CALLIE HOLT to the aforementioned deed of trust; have caused said deed of trust to be recorded with the Recorder of the City and County of San Francisco; have thereby caused a cloud on the title of plaintiffs' property at 456 Silver Avenue in the City and County of San Francisco; that the defendants, and each of them, now threaten to take a default under the terms of the alleged deed of trust for the alleged failure of plaintiffs to pay an alleged promissory note secured by the deed of trust; that said deed of trust and promissory note, if it exists, is a forgery; that plaintiffs did not sign the aforementioned deed of trust and promissory note, if it exists; . . ." Other allegations support the prayer to enjoin any action to enforce the note and deed of trust. In a second cause of action the plaintiffs complain that the defendants have clouded their title. It is

specifically alleged that the recorded deed of trust is false, fraudulent and forged. In the third cause of action the charging allegations of the second cause of action are incorporated, and it is further alleged that the defendants conspired to record the purported deed of trust and thereby caused the plaintiffs to suffer $20,000 damages. The fourth cause of action, against Nolfi alone, alleges that plaintiffs were induced to sign the construction contract by reason of the contractor's false representation that he would do the work, when he in fact had no intention of doing so, and in fact failed to do so. The fifth cause of action, against Nolfi alone, alleges breach of the construction contract to the damage of plaintiffs in the sum of $6,500.[2]

Plaintiffs prayed for a temporary restraining order and a preliminary injunction which were granted, the latter upon the deposit of $1,000 pursuant to stipulation. They also sought a decree quieting title against the claims of defendants, perpetually enjoining them from asserting any claims, ordering the cancellation of the deed of trust, and a declaration that it was fraudulent, void and of no effect. They claimed damages for slander of title of $20,000, and for breach of contract of $6,500.

The defendant Nolfi and the defendant financiers filed separate answers in which they generally denied the charging allegations of the complaint.

I

■ "When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] ■ When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805]. See also *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d

---

[2]At the conclusion of plaintiff's case their attorney moved the court to permit amendment of the complaint to include an affirmative allegation of usury on the grounds that the premium of $750, plus the 10 percent interest called for by the note, exceeded the rate of interest permitted by law. The court stated, "I will allow the amendment to the complaint and deem it denied." At the request of the defendants it was further ordered that it be deemed that each had asserted a special defense of the statute of limitations. No amended pleading was ever filed although the court suggested it. The defendant financiers requested that the court order the plaintiffs to elect between forgery and usury, and the motion was denied. The court found that the note and deed of trust were not executed by plaintiffs, and made no findings on the issue of usury. (See parts III and VI below.)

362]; *Callahan* v. *Gray* (1955) 44 Cal.2d 107, 111 [279 P.2d 963]; *Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123] [overruled on other grounds *Zuckerman* v. *Underwriters at Lloyd's* (1954) 42 Cal.2d 460, 474 (267 P.2d 777)]; *Maslow* v. *Maslow* (1953) 117 Cal.App.2d 237, 243 [255 P.2d 65]; and *Cummings* v. *Kendall* (1940) 41 Cal.App.2d 549, 554-555 [107 P.2d 282].)

Defendants, however, urge that application of principles set forth in *Herbert* v. *Lankershim* (1937) 9 Cal.2d 409 [71 P.2d 220] demonstrate that there is no substantial evidence to support the judgment. In that case, after recognizing the substantial evidence rule, the court continued, "This rule, however, does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence. . . . There must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reasonably supports the judgment as applied to the peculiar facts of the case. The rule announced in *Morton* v. *Mooney et al.,* 97 Mont. 1 . . ., correctly states the rule which has been approved by this court in a number of our decisions. It is thus stated:

" 'While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago etc. Ry. Co.,* 78 Mont. 97 . . .), and in determining this question "the credulity of courts is not to be deemed commensurate with the facility and vehemence with which a witness swears. 'It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude the judgment.' " ' " (9 Cal.2d at pp. 471-472. Cf. *Shearer* v. *Cooper* (1943) 21 Cal.2d 695, 703 [134 P.2d 764].)

With the foregoing principles in mind, defendants' attacks on the findings may be reviewed.

## II

The court found, "VIII. On March 9, 1962, plaintiffs signed a Promissory Note dated March 6, 1962, secured by a deed of trust also dated March 6, 1962 upon said real property. Said documents were signed by plaintiffs at the request and direction of defendant ADRIAN NOLFI. That at the time of signing said documents and prior thereto the defendant ADRIAN NOLFI falsely and fraudulently concealed from plaintiffs the mature

[*sic*] and legal significance of said documents and falsely and fraudulently misrepresented to plaintiffs the nature and legal significance of said documents. The principal amount of said note was the sum of $3,450.00, plus interest thereon at 10% per year, payable to the order of ADRIAN NOLFI. That said Promissory Note dated March 6, 1962, in the sum of $3,450.00, plus interest, was purportedly the consideration in payment of aforesaid contract price of $2,700.00, including costs of financing."

All of the defendants attack the sufficiency of this finding. From the record it is clear that there was only one meeting between plaintiffs and the contractor at which the note and deed of trust could have been signed if they were. That meeting was at the Hightowers' residence on the day the construction proposal dated March 9, 1963 was accepted and signed by plaintiffs, and Hightower was present as well as the principals.

Hightower testified that after Nolfi gave him the estimate of $2,700 by telephone, arrangements were made for the contractor to come over and see Mrs. Hightower. Nolfi came and Hightower observed his wife and mother-in-law sign the proposal, and receive and retain a copy. According to the witness, Nolfi said that he would finance the work himself for a price of $2,700 payable at the rate of $40 per month to commence when the job was completed and inspected and passed by the city. Hightower stated that he was sitting at the dining room table with the others, and that no other documents were presented to or signed by the plaintiffs.

Plaintiff testified that the only time she met Nolfi was when he came to her residence to get together on a proposed agreement for work to be done at the house on Silver Avenue. She reiterated that the contractor explained that he did his own financing, that it was agreeable that the sum of $2,700 be paid in monthly instalments of $40, and that the payments would begin when the job was completed and inspected and approved. She acknowledged that she and her mother signed the proposal for the work. She denied that she or her mother signed any other documents for Nolfi on that date or any other date. The original note and deed of trust were exhibited to her and she replied "No" to the question ". . . I will ask you if to your knowledge you or your mother signed either one of those." On cross-examination she stated that Nolfi did not present a deed of trust and note; that she only signed one paper, the proposal, on that day; that she did not sign a note or deed of trust or any other paper in blank; that the proposal was on a board with a carbon underneath, held in place by a clamp; that Nolfi filled out the proposal in their presence; that she did not see any other papers; and that when the proposal was signed by all the parties she was given the yellow copy. She further denied that she ever authorized Nolfi to have any documents notarized.

On the other hand, Nolfi himself testified that on the occasion he met with plaintiffs and Hightower he expected that although the property was in plaintiffs' names, Hightower, who had conducted the prior negotiations would be a party, and he wrote "Charles & Rheba Forte" on the proposal, but struck out the "Charles" at the request of plaintiff Forte who told Nolfi not to include her husband because the property was owned strictly by her mother and herself. He stated that Hightower said it was their affair not his, and he did not join plaintiffs and the contractor at the dining room table where the proposal was discussed but remained on a sofa in the living room within hearing distance. Nolfi testified that there was a discussion of financing prior to the signing of the proposal; that he told them the banks would not lend because the property was under condemnation proceedings; that he brought out that there was an additional fee for obtaining a loan secured by a second deed of trust; that he explained that defendant Belli of the Willbell Company had obtained a commitment whereby the financing would be available on the basis of the amount provided in the note which would be discounted when he assigned the note; and that he inserted in the proposal the wording *"Note and Deed Trust on project including costs of financing and discount,"* which followed the language, "We hereby propose to furnish labor and materials—complete in accordance with the above specifications for the sum of: *Two Thousand Seven Hundred Dollars ($2,700.00)* with payment to be made as follows: . . ."

Nolfi stated he had with him the note for $3,450 payable to him in instalments of $40 a month with interest at 10 percent and the deed of trust, both of which had been typed up at Belli's office; that he explained to plaintiffs that the face of the note was $3,450; and that this was the only way to finance it because of the status of the property; that the plaintiffs voiced no objection to the proposed method of financing and signed the note and deed of trust in his presence.[3]

Defendant Nolfi first complains that the court did not determine whether or not the contract with the words "including costs of financing and dis-

---

[3]Strangely enough, Nolfi never testified directly that he witnessed the plaintiffs affix their signatures to the note and deed of trust. It was assumed (perhaps from unused portions of his deposition) that he had so testified, and he testified that he had. He was asked by the attorney for the financiers, "You have testified that Mrs. Forte and her mother, Mrs. Holt, signed the note and the deed of trust and the contract proposal in your presence?" He answered, "That is right." There are references in questions to "the note that Mrs. Hightower and her mother allegedly signed," to "the time these alleged documents were signed" to "the three documents that you [Nolfi] say that Mrs. Hightower and her mother signed," to "when she [plaintiff Forte] signed this alleged installment note and proposal . . . . The deed of trust and proposal . . ." and to "the documents after they were signed," all of which indicate that Nolfi in his answers was affirming that the documents were executed by plaintiffs.

count" was to cover a contract price of $2,700, plus a financing charge of $750, or whether the financing charges were to be included in the sum of $2,700 set forth in the proposal and contract for the work to be done. In finding VII the court found, "On March 9, 1962, defendant ADRIAN NOLFI agreed in writing to perform certain repairs on said real property for a contract price of $2,700.00 including costs of financing." ■ If this finding means what it says it is supported by the testimony of plaintiff Forte, and indicates that the judge, who noted "either one of those people are perjuring themselves," rejected the contrary testimony of the contractor.

■ Next he asserts that since, as set forth above in finding VIII, the court expressly found that the plaintiffs signed the note and deed of trust, there could be no forgery. The court also found, however, that the contractor falsely and fraudulently concealed from plaintiffs, and misrepresented to them, the legal nature and legal significance of those documents. In finding X the court recited, "At no time did plaintiffs have knowledge that any document signed by them was intended to be a lien or encumbrance upon said real property, nor did plaintiffs ever intend to execute or deliver to defendant ADRIAN NOLFI any document creating such lien or encumbrance. That if plaintiffs had known the true nature and legal significance of the Promissory Note and deed of trust hereinabove referred to plaintiffs would not have signed them." Finding XVI reads, "That plaintiffs had no notice or knowledge of the lien of said Deed of Trust until they received a copy of said Notice of Default."[4]

"The crime of forgery is committed when a defendant, by fraud or trickery, causes another to execute a deed of trust or other document where the signer is unaware, by reason of such trickery, that he is executing a document of that nature." (*People* v. *Parker* (1967) 255 Cal.App.2d 664, 672 [63 Cal.Rptr. 413]. See also *Buck* v. *Superior Court* (1965) 232 Cal. App.2d 153, 156-157 and 162 [42 Cal.Rptr. 527, 11 A.L.R.3d 1064] [cert. den. (1965) 382 U.S. 834 (15 L.Ed.2d 77, 86 S.Ct. 77)]; *Wright* v. *Rogers* (1959) 172 Cal.App.2d 349, 362-363 [342 P.2d 447]; and *People* v. *Nesseth* (1954) 127 Cal.App.2d 712, 719 [274 P.2d 479].)

It is asserted that the foregoing principle cannot apply because plaintiff Forte admittedly went to real estate school and purchased and borrowed on real estate. She admittedly would recognize and know the legal effect

---

[4]Plaintiffs concede that this finding may not be technically correct because plaintiff Forte testified that she first learned of the lien of the deed of trust when contacted by a deputy district attorney who was investigating the case. She later observed she was not sure whether or not that knowledge preceded the receipt of the copy of the notice of default. In any event, it is clear that the court found she did not learn about the deed of trust until after it was recorded.

of a deed of trust were she to see one. This argument assumes that she saw the document she ostensibly signed. Her denial that she or her mother signed the documents supports the inference that she did not knowingly sign them.

There is no evidence of the manner in which the contractor so secured the plaintiffs' signatures to the documents, or concealed or misrepresented their nature and legal significance. Of course, if they were in fact tricked into signing they would not be aware of that fact until ultimately confronted with their signatures on the instruments. Therefore, they could hardly be expected to explain how they were obtained in the first instance. Plaintiffs now suggest that the signatures were obtained when the proposal and carbon copy, admittedly signed, were presented to the plaintiffs on the clipboard. (Cf. *People* v. *Parker, supra, passim,* pp. 667-670.)

Defendants contend that the testimony of Hightower and plaintiff Forte that no such papers were signed should be wholly rejected because the whole of the evidence requires a finding that the plaintiffs knowingly signed the documents. They claim Hightower is impeached because he was contradicted by Nolfi with respect to the manner in which they met, with respect to the manner in which the plans were secured and paid for, and with respect to Hightower's participation in the discussion on March 9, 1962. On appeal, however, it must be assumed that the trial court resolved these conflicts in favor of Hightower and against the credibility of Nolfi.

Plaintiff Forte's testimony is allegedly impeached because she swore in the complaint that Nolfi "did and performed nothing on the property of plaintiffs" when the uncontradicted evidence (see part IV below) demonstrated that he did, because she testified equivocally concerning her brother's interest in the premises next door and arrangements made with him for joint construction of a wall, because her explanation of her investigation of the nature of the payment book was incredible, because she failed to contend the instruments were not genuine, or complain of the amount due when she admittedly learned of the existence of the documents, and because of her natural bias and interest in the outcome of the case. The weight to be given those factors, and the testimony of Nolfi and other evidence which tended to impeach his testimony was for the trial judge.

Defendant Nolfi unwarrantedly attempts to create some mystery out of the explained use by plaintiff of her maiden name in connection with the contract and this litigation. He also would make capital out of the fact that the plaintiffs' attorney failed to join in his attorney's offer to submit the documents to any handwriting expert the court might select. This re-

fusal did not, of course, preclude any of the defendants from engaging a handwriting expert to examine the documents. Plaintiffs' attorney pointed out at the time, "The problem is this, your Honor, that forgery not only is someone else writing the name but it would also be someone sticking under a piece of paper and signing the name, and, then, all of a sudden having it there." No compelling adverse inference arises from the refusal. The court found (IX) that defendant Belli caused the defendant notary to acknowledge the signature of plaintiffs on the "Promissory Note"(*sic*, deed of trust), despite the fact that plaintiffs never appeared personally before her, and never acknowledged that the signatures upon the deed of trust were theirs. The judgment exonerated the notary with her costs of suit. (Cf. *Transamerica Title Ins. Co.* v. *Green* (1970) 11 Cal.App.3d 693, 699-703 [89 Cal.Rptr. 915].) If there was error as contended by Nolfi, it is for the plaintiffs to complain, and the court's action throws no light on the validity of the finding under review.

It is also pointed out by all the defendants that an adverse inference should be drawn from the failure of plaintiff Holt to testify. (See *Spath* v. *Seager* (1940) 39 Cal.App.2d 10, 14-15 [102 P.2d 350].) The weight to be given that shortcoming was for the trial court. This court has been invited to compare the documents in question with numerous other authenticated signatures of plaintiffs in the record. In view of the trial court's finding, this exercise is somewhat fruitless. It is noted, however, that the signatures on cursory examination do not foreclose the possibility of tracing or carbon impression.

 Viewing all of the evidence it is concluded that application of the principles enunciated in *Herbert* v. *Lankershim, supra,* does not compel a reversal of the finding in question. As stated in *Shearer* v. *Cooper, supra,* "Unlike the facts in that case, here there was in addition both documentary evidence and evidence of the conduct of the parties to support the finding and conclusion that the plaintiff was warranted in relying upon and actually did rely upon the defendant's false representations. The fact that there was also documentary evidence from which a contrary inference might have been drawn does not militate against the substantial nature of the conflict by which this court is bound in resolving intendments and inferences in favor of the action of the trial court." (21 Cal.2d at p. 703.)

 "The fact that some inference other than that which has been drawn by [the trier of fact] may appear to an appellate tribunal to be more reasonable, affords no sufficient reason for disturbing the inference in question. [Citations.]" (*Hamilton* v. *Pacific Elec. Ry. Co.* (1939) 12 Cal.2d

598, 602-603 [86 P.2d 829]. See *Cummings* v. *Kendall, supra,* 41 Cal. App.2d 549, 554.)

The findings reviewed above are supported by sufficient evidence. Therefore, the further findings (XVII) and conclusions (I and II) and the judgment declaring the promissory note and the deed of trust and the lien on the property created by the recording of the deed of trust each to be null and void and of no legal effect must be sustained. (See *Trout* v. *Taylor* (1934) 220 Cal. 652, 656 [32 P.2d 968]; and see *Wright* v. *Rogers, supra,* 172 Cal.App.2d 349, 362.)

## III

The court found, "XIII. That prior to the execution and recording of said Deed of Trust and the assignment thereof the defendants PETER WILLIAMS and BRUNO BELLI individually and doing business as WILLBELL COMPANY, KEITH COMPANY, a partnership, and defendant ADRIAN NOLFI agreed to form and organize a combination and joint enterprise, the purpose of which was to falsely and fraudulently obtain plaintiffs' signatures on a promissory note payable to defendant ADRIAN NOLFI secured by a deed of trust upon said real property and contemporaneously with the recording of said Deed of Trust to record an assignment thereof for the purpose of depriving plaintiffs of any defenses they might be able to assert against defendant ADRIAN NOLFI upon said Promissory Note and Deed of Trust."[5]

Plaintiffs never had any direct dealings with the Willbell Company, or Belli and Williams its principals, or with the Keith Company, or Dr. and Mrs. Davies, its principals. The evidence concerning the alleged conspiracy was elicited from Nolfi, Belli and Williams.

The contractor testified that in his remodeling business contracts were financed through notes and deeds of trust which he took in his name when he had the responsibility of securing financing, and that he assigned them to banks and savings and loan associations or to private investors, when, as junior obligations, they would not be accepted by a financial institution.

Belli and Williams were associated in Willbell Company. Belli, a real estate broker, conducted his business at 1154 Divisadero under the name of Capital Mortgage Company. Williams was a director and treasurer of a savings and loan association at 1150 Divisadero, and also conducted an

---

[5]The court also found, "VI. [¶] At all times herein mentioned defendants PETER WILLIAMS and BRUNO BELLI individually and doing business as WILLBELL COMPANY were the agents of the defendant KEITH COMPANY and in the matters herein referred to were acting as such agents within the course and scope of their authority."

insurance business under his own name. Willbell Company, their partnership, had no separate office. It was engaged in business as a finance company or loan brokerage business, lending money and buying secured notes at a discount with funds which it generally secured from other sources. It also bought and sold some real property. Belli was the contact man who made the loans and bought the property. Williams obtained the money for loans, and handled the collections. Williams acknowledged that Willbell had entered into many transactions similar to that involved in this case.[6]

At the time of the trial in September 1968, Belli had known Nolfi for approximately 15 years and had been associated with Williams for the same number of years. Belli acknowledged that prior to the loan in question he had participated in more than 10 transactions involving loans in which Nolfi was interested. When queried, he replied that 100 such transactions would be too many, and that he would have to consult his records to answer whether there were more than 50. Williams stated he did not handle that end of the business, that he presumed Nolfi had approached Willbell, through Belli, for loans on prior occasions, although he had not known Nolfi personally prior to this deal. Both Belli and Williams offered to check the records concerning prior loans in which Nolfi was interested, but no one pursued the matter. Nolfi acknowledged he had many prior transactions with the Willbell Company and its partners, in which he had taken secured notes to them and they had obtained a buyer.

Williams testified that the Keith Company was a partnership engaged in loaning money, in which the partners were a Dr. Julian Davis and his wife, Audrey, who was a sister-in-law of Williams; that he had had business relationships with the partnership for many years; and that all of the loans made by the Keith Company had been channeled through him personally. Nolfi disclaimed any prior knowledge or acquaintance with the Keith Company or its individual partners, although he acknowledged that he had participated in another transaction through Willbell in which Keith Company was the ultimate assignee.

---

[6]The record indicates Williams' concurrence in the following statement, "And basically, these transactions would work in this fashion: To do some work on some property, let us say, costs $2,000. The contractor would come to you, and he would say, 'It is going to cost me $2,000 to pay for my work, materials, and my profit,' and he would then get a loan for, let us say, $2,500 plus interest. The contractor would have the owners of the property sign an installment note for $2,500 plus interest, made payable to the contractor, and they would execute a deed of trust to this contractor. He would then bring these documents to you, and he would execute an assignment to your principal. These documents would then be recorded, and you would put a check for $2,000 — not $2,500, but for $2,000 in escrow; . . ."

Nolfi testified that in the transactions under review after meeting Hightower at the premises he investigated financing at Hightower's request. He stated that he contacted two of the three banks with which he was doing business at that time, without success. He was thoroughly cross-examined on that testimony, and was unable to say whether he had gone to the banks, or telephoned, and he was unable to say what information he had given the banks concerning the property or the prospective borrowers. He was impeached by his deposition in which he had stated, "I just got the information they were refused. I didn't even try, because they told me they had tried. I think it was the Bank of America."

The contractor then went to Belli. Belli and Williams looked at the property. They determined to go ahead with the loan, and a preliminary title report was ordered and issued to Belli on January 12, 1962.[7] Thereafter, there was a further discussion between Belli and Nolfi, and Nolfi was told he would get $2,700 for a $3,450 note. Nolfi understood the note was to be assigned to Willbell or some one for whom they were the agent. He never discussed with Belli or Williams what commission they would get in the transaction, and he never paid them anything himself.

Thereafter, Belli prepared the instalment note, the deed of trust, and the assignment and delivered them to the contractor "with the understanding he was going out and have them signed."

Nolfi testified that after the meeting with plaintiffs and Hightower he delivered the documents to Belli. When cross-examined by the financier's attorney, he admitted he might have delivered them to the title company. Belli testified that he next saw the papers at the title company when the transaction was consummated, but he acknowledged that Nolfi might have returned them to him. None of the documents had the acknowledgment form completed by the notary until after they were deposited with the title company.

Williams made out a check for $2,700 from the funds of the Davises for deposit with the title company. Belli took the check to the title company

---

[7]Further confusion was engendered in the testimony of Nolfi by questions directed to his knowledge of the state of the title to the premises. At the trial he testified that when he presented the proposal he knew that plaintiffs owned the property "because of the investigation that we had made." He could not tell when he had seen the title report. In his deposition he had stated, ". . . I took it at the time that it was his [Hightower's property], until later I learned differently. Q. Do you recall when you found out it was not his property? A. Yes, when we finally agreed on the price, and the contract was to be written, then it was disclosed that the property was owned by his mother-in-law and his wife." In explanation Nolfi testified that he had an opportunity to consult his file since his deposition was taken, and that the agreement as to the price was in fact prior to the date he went out to sign the contract.

and approved instructions under which in return for a title insurance policy, a memorandum of insurance, the note, the deed of trust, and an assignment to Keith Company, the $2,700 was to be disbursed, $2,647 to Nolfi for the assignment and the balance for costs and expenses, including $3 to the notary. The documents requested were subsequently received by Williams.

Williams testified that neither he nor Belli personally received a fee for making a loan, that the Willbell Company bought the "deed of trust" for the Keith Company, as agents of that company, and was to receive the difference between $3,450 and $2,700, or $750, as the payments came in each month on a percentage basis. He stated with respect to the $750, first, that it was for procuring the loan for Nolfi, and corrected himself to indicate that it represented a fee for buying the loan for the Keith Company. Belli testified originally that the $750 represented a commission earned for procuring the loan for "the Hightowers" (*sic,* the plaintiffs). He further indicated, "We purchased the loan by assignment" with funds from Dr. Davis, and that a proportional part of each monthly payment represented a commission.

A ledger sheet was produced which showed that of the $80 which was inexplicably credited on the note, $17.40 was credited to Willbell, and $62.60 to Davis.

There is nothing in the foregoing evidence to support the finding that the named defendants conspired "to falsely and fraudulently obtain plaintiffs' signatures on a promissory note." If as found, Nolfi did so, there is not a scintilla of evidence to indicate that the remaining defendants had any inkling that such was his intent, or, prior to the time the complaint was filed June 3, 1963, any knowledge that he had done so.

Plaintiffs do not attempt to justify the finding in that respect. They assert, "The conclusion to be drawn from the defendants in participating in such a course of activity is either that (1) they had entered into a scheme to defraud homeowners by grossly overcharging them for home repairs, or (2) they had entered into a scheme to exact usurious interest from homeowners to finance home repairs. While their scheme was designed to give the superficial appearance of selling a note and deed of trust at discount, the actual effect was to charge interest in excess of the 10% maximum fixed by California Constitution, Article XX, § 22."

The evidence and findings fail to show that there was any scheme to defraud the plaintiffs by grossly overcharging them for home repairs. The proposal called for work at a price of $2,700. The court found that the reasonable value of the repairs actually performed by the contractor was the

sum of $2,100. From the discussion of the sufficiency of this finding in the review of damages (see part IV below), it is clear there is no evidence to show that the contractor at the outset intended to do less than the work called for by the plans, or that the work was not reasonably priced. The only justification for the offset of $600 from the contract price is a deviation which the court, on conflicting evidence, found was not authorized.

The court made no findings on the issue of usury (see fn. 2 above). Nevertheless because it may affect the ultimate disposition to be made of the case, it is necessary to review and apply the pertinent principles.

"Section 22 [second] of article XX of the California Constitution provides that, except as to certain enumerated classes of persons not involved here, a lender shall not receive more than 10 per cent per annum upon any loan or forbearance of money." (*Heald* v. *Friis-Hansen* (1959) 52 Cal.2d 834, 836-837, fn. omitted [345 P.2d 457]. See also *Buck* v. *Dahlgren* (1972) 23 Cal.App.3d 779, 785, fn. 4 [100 Cal.Rptr. 462]; *Charlotte Guyer & Associates* v. *Franklin Factors* (1963) 211 Cal.App.2d 690, 693-694 [27 Cal. Rptr. 575].)

■ "It is a question of fact as to whether a particular transaction is or is not usurious. [Citation.] Where the form of the transaction makes it appear to be nonusurious, it is for the trier of the fact to determine whether the intent of the contracting parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction. [Citations.] The trial court may look beyond the form of the transaction and ascertain its substance. [Citation.]" (*Janisse* v. *Winston Investment Co.* (1957) 154 Cal.App.2d 580, 582 [317 P.2d 48, 67 A.L.R.2d 225]. See also *Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983, 989 [80 Cal.Rptr. 345, 458 P.2d 185]; *Charlotte Guyer & Associates* v. *Franklin Factors, supra*, 211 Cal.App.2d 690, 694; *Harris* v. *Gallant* (1960) 183 Cal.App.2d 94, 99 [6 Cal.Rptr. 630]; and *Wood* v. *Angeles Mesa Land Co.* (1932) 120 Cal.App. 313, 317 [7 P.2d 748].)

■ "When a bonus is paid for the making of a loan, it must be considered as interest, and taken out of the principal at the time of the making of the loan, and interest then computed upon the remainder of the principal. If upon such calculation, the interest so computed, plus the bonus, exceeds [the statutory limit] per annum, the contract is usurious, and if not, there is no usury." (*Otis* v. *1. Eisner Co.* (1935) 7 Cal.App.2d 496, 499-500 [46 P.2d 235]. See also *Devers* v. *Greenwood* (1956) 139 Cal.App.2d 345, 350-351 [293 P.2d 834].) ■ It is readily apparent that the note pre-

pared by Belli which Nolfi purported to have signed was under the circumstances usurious. It called for the payment of a $750 bonus with interest in addition to the maximum rate of interest on the $2,700 actually advanced.

The question of whether the usury would taint the note in the hands of the assignee is governed by principles set forth in *Smith* v. *G. Cavaglieri Mortgage Co.* (1931) 111 Cal.App. 136 [295 P. 366], as follows: ". . . we find the rule relative to sale of negotiable paper, which is supported by practically all of the authorities, to wit: 'After a negotiable instrument has once been validly negotiated by a transfer upon valuable consideration, it becomes an article of commerce and can be bought and sold as freely as any other property, the rate of discount being governed by the market value of each instrument. Such transactions are not within the letter or spirit of the usury laws.' And on page 935 of the same volume, the following statement, which is likewise supported by the vast weight of authority: 'But when the chose discounted is obtained directly from the maker or before it has acquired validity by a transfer for value, it can be nothing more than the maker's promise to pay, and the purchase of such a promise at a discount exceeding the lawful rate of interest is merely making a loan at a usurious rate. The rule applies when the lender takes the note under such circumstances from one known to be the agent of the maker.'" (111 Cal.App. at p. 141. See also *Lee* v. *Marchetti* (1970) 4 Cal.App.3d 97, 101-102 [84 Cal.Rptr. 55]; *Harris* v. *Gallant, supra,* 183 Cal.App.2d 94, 98-99; and *Janisse* v. *Winston Investment Co., supra,* 154 Cal.App.2d 580, 583-587; but cf. *Techow* v. *Pollack* (1952) 111 Cal.App.2d 556, 557 [244 P.2d 915]; and *Harris* v. *Pollack* (1950) 101 Cal.App.2d 26, 28-30 [224 P.2d 824].)

In the two cases involving *Pollack,* judgments for the defendant were sustained. In the second case the court pointed out, "Plaintiff's witnesses testified to facts which if believed by the trial judge would have supported findings for her. Defendant testified that he purchased the note and second trust deed at a discount, in good faith and for value. Other testimony and facts in the record support his testimony. So, under the familiar substantial evidence rule the findings on the merits must stand. (*Harris* v. *Pollack,* 101 Cal.App. 2d 26 . . . .)" (111 Cal.App.2d at p. 557.)

In *Smith* v. *G. Cavaglieri Mortgage Co., supra,* the court examined a transaction where, as here, the contractor purported to act for the borrower in securing a loan, and the papers prepared by the lender provided for a note running to the contractor and its assignment to the lender at a sum, less than its face value, which was to be advanced for construction work. The court concluded that the finding of the trial court that the transaction

constituted the sale of a negotiable instrument to the lender, and not a loan had no substantial support in the testimony. The court stated, "The mere fact that [the lender] called it a 'purchase' or 'discount' of the note can be given no weight as testimony in view of the record disclosing that his company drew all the papers, passed upon the plans and specifications, carried the transaction in the name of [the borrower], advanced the money to [the borrower], paid off the purchase price, and knew that the entire transaction was an arrangement or scheme to finance the raising of money to erect an apartment house; that [the contractor] had done nothing or given nothing, other than his promise to build the apartment house, which was dependent upon the securing of a loan of money to pay the expenses thereof. It is a case where the name signified nothing. The transaction speaks for itself, and speaks only in one way—the name of [the contractor] appears upon the papers only to enable the [lender] to obtain a bonus in addition to interest, and thus circumvent the usury law." (111 Cal.App. at pp. 143-144.)

In the second *Pollack* case the court distinguished the *Smith* case as follows: "In the cited case the borrower and lender dealt directly, the documents were prepared in the office of the lender, and the evidence disclosed a written agreement between borrower and lender reciting that a loan was being made of $105,000 evidenced by a note for $110,000." It also pointed out, "Pollack [the financier assignee] did not prepare the documents or escrow instructions; this was done by Rosenblum, Harris [the owner-borrower] and King [the contractor's officer]. Rosenblum was the agent of Harris and Travelodge Corporation [the contractor-payee-assignor] and not the agent of Pollack." (101 Cal.App.2d at p. 29.)

In this case it is clear that Williams at all times represented the Keith Company. Even if it be assumed that Belli in preparing the papers was acting for Willbell, as an independent broker, he was acting as agent for the Keith Company because he never had any contact with the borrowers directly or indirectly, and it is nowhere suggested that Belli or Willbell were authorized to act for the plaintiffs. It is clear that Williams, Belli and Nolfi each intended that $2,700 was to be advanced for a secured promissory note in the sum of $3,450 calling for interest at 10 percent on that sum. The knowledge of Williams was attributable to the Keith Company for whom he acted. (Civ. Code, § 2332.)[8] The case therefore falls within the orbit of *Smith,* and the cases which have approved a similar conclusion.

The record shows that it was intended that the usurious fruits of the loan

---

[8]Civil Code section 2332 provides: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."

were to be divided so that Keith Company would receive the return of its $2,700 in instalments with 10 percent interest and Willbell would receive $750 in instalments with interest at 10 percent. ▪ The principles governing the right to demand and receive extra charges are set forth in the following instructions which were approved in *Klett* v. *Security Acceptance Co.* (1952) 38 Cal.2d 770 [242 P.2d 873]: " 'A lender is not prohibited from charging an extra and reasonable amount for incidental services, expenses or risk additional to the lawful interest other than for the loan of money. He may make a reasonable charge for investigating, arranging, negotiating, brokering, making, servicing, collecting and enforcing his obligation.

" 'Such items, however, must be confined to specific service or expense incidental to the loan incurred in such a way as to preclude it being a device through which additional interest or profit on the loan may be exacted.' " (38 Cal.2d at pp. 787-788. See also *In re Fuller* (1940) 15 Cal.2d 425, 433-434 [102 P.2d 321]; *Beneficial Loan Society, Ltd.* v. *Haight* (1932) 215 Cal. 506, 517 [11 P.2d 857]; *Rice* v. *Dunlap* (1928) 205 Cal. 133, 135-136 [270 P. 196]; *Haines* v. *Commercial Mortgage Co.* (1927) 200 Cal. 609, 616-617 [254 P. 956, 255 P. 805, 53 A.L.R. 725] [dictum on other grounds disapproved *Heald* v. *Friis-Hansen, supra,* 52 Cal.2d 834, 840]; *Wallace* v. *Zinman* (1927) 200 Cal. 585, 597 [254 P. 946, 62 A.L.R. 1341]; *Niles* v. *Kavanagh* (1918) 179 Cal. 98, 100-101 [175 P. 462, 1 A.L.R. 831]; *Thunderbird Investment Corp.* v. *Rothschild* (1971) 19 Cal. App.3d 820, 828-830 [97 Cal.Rptr. 112]; *Cambridge Dev. Co.* v. *U. S. Financial* (1970) 11 Cal.App.3d 1025, 1028-1029 [90 Cal.Rptr. 333]; *Clarke* v. *Horany* (1963) 212 Cal.App.2d 307, 310 [27 Cal.Rptr. 901, 4 A.L.R.3d 643]; *Charlotte Guyer & Associates* v. *Franklin Factors, supra,* 211 Cal.App.2d 690, 694; *Guyselman* v. *Ramsey* (1960) 179 Cal.App.2d 802, 806 [4 Cal.Rptr. 133]; *Penziner* v. *West American Finance Co.* (1933) 133 Cal.App. 578, 589 [24 P.2d 501]; *Wood* v. *Angeles Mesa Land Co., supra,* 120 Cal.App. 313, 324-325; and *Waybright* v. *Meek* (1928) 90 Cal.App. 13, 17-18 [265 P. 370].)

▪ From the foregoing precedents, the following rules may be distilled, "The exaction of a commission from the borrower by the lender's agent will render the transaction usurious if such exaction is known to and authorized or ratified by the lender. (*Niles* v. *Kavanagh,* 179 Cal. 98 . . . ; *Rice* v. *Dunlap, supra,* notes, 21 A.L.R. 797, 850; 53 A.L.R. 743, 755.)" (*Penziner* v. *West American Finance Co., supra,* 133 Cal.App. at p. 589. See also *Haines* v. *Commercial Mortgage Co., supra,* 200 Cal. at p. 617; *Clarke* v. *Horany, supra,* 212 Cal.App.2d at p. 310; and *Guyselman* v.

*Ramsey, supra,* 179 Cal.App.2d at p. 806.) On the other hand ". . . the law is settled that a loan is not rendered usurious where the lender's agent without the knowledge, consent, authorization or ratification of the lender, collects a fee for his own benefit." (*Thunderbird Investment Corp.* v. *Rothschild, supra,* 19 Cal.App.3d at p. 830.) The mere fact that the lender knows a commission is being exacted is not fatal when the commission is paid with the consent of the borrower to an agent who has been employed by him to seek a loan, or to a broker whose services have been rendered to both parties, and who does not rebate a part of the commission to the lender. (See *Niles* v. *Kavanagh, supra,* 179 Cal. at pp. 100-101; *Guyselman* v. *Ramsey, supra,* 179 Cal.App.2d at p. 806; and *Waybright* v. *Meek, supra,* 90 Cal.App. at pp. 17-18.)

▮ Turning to the facts in the instant case, as found by the court and sustained by the evidence, it is clear that the plaintiffs who were not even cognizant of signing the note or deed of trust, never authorized the payment of any brokerage or commission. The transaction contemplated that the lender, nominally Nolfi the payee of the note, but as has been demonstrated, actually Keith Company as assignee of the note and deed of trust, would be entitled to collect the full principal amount of the note including the bonus over the sum actually advanced and interest on the total at 10 percent. There was no separate obligation of the borrowers running to Willbell to show that the partners were being compensated as brokers. Under these circumstances the case is governed by *Wood* v. *Angeles Mesa Land Co., supra,* where the court upheld a finding of usury and stated, "Assuming the transaction before us, as we do, to be a loan, the further point is made that where commissions, bonus and other charges spread over the whole period of the loan or forbearance are within the limit set by law, there is no usury. Appellant points out nothing that would indicate the computation of the trial court to have been erroneous from this theory. The entire argument on this point deals with the commission paid to an agent by the Land Company. This was not one of the items included in the contract, nor in either the mortgage or trust deed. Just how appellant might have divided the proceeds of the unlawful interest does not become important. The finding, unassailed, is that this payment was not charged to plaintiffs nor brought to their knowledge or notice. It is apparent that if this item had been included then the twenty per cent added thereto would have had the effect noted in the other items. Under the authorities which recognize that there will be, in practically every loan, some expense, it must be held that these expenses should be incidental to the loan and in some measure a part of the transaction. It would be carrying the rule too far to hold that one could justify an usurious loan by a simple showing that he had, aside from the negotiations, expended sums as private commissions in consummating the deal.

These charges, to affect the rate, must affect the principal. If it could be shown that a part of the interest collected or charged, under the agreement, or by consent or arrangement of the parties, was really not interest nor charge for forbearance such a showing would be legitimate defense to the charge of usury.· But no such showing is here made nor attempted." (120 Cal.App. at pp. 324-325.)

Although finding XIII cannot be sustained so as to render the defendant financiers responsible for Nolfi's acts in securing the plaintiffs' signatures, the record warrants and requires a finding, as urged by plaintiffs, that the defendants conspired to attempt to exact usurious interest from the plaintiffs in connection with the transaction under which $2,700 was furnished for the repairs to plaintiffs' premises. The effect of such a finding is reviewed below.

## IV

In their fifth cause of action the plaintiffs sought damages of $6,500 from Nolfi alone for breach of the construction contract. The court found that the contractor "agreed in writing to perform certain repairs on said real property for a contract price of $2,700.00, including costs of financing" (finding VII); that he "failed to complete the repairs referred to in said written agreement . . ." (finding XIV); and that "the reasonable value of the repairs actually performed by the defendant .·. . is the sum of $2,100.00" (finding XIX). Nolfi contends that there is absolutely no evidence to show that any damage was suffered by the alleged breach of contract in any sum.

The contractor acknowledged there was a deviation in the work. According to him, the owner of the adjoining property on the west, which needed repairs to a wall on the east side between the plaintiffs' property and the stairs leading up to the residence on that property, advised Nolfi to get in touch with the buyer of the property, plaintiff Forte's brother, by calling plaintiff. Thereafter, through arrangements made by plaintiff, Nolfi met Forte at the property and gave him an estimate of what certain work would cost. No agreement was entered into because Forte did not have the money for the repairs discussed. Plaintiff's brother acknowledged having the conversation, but both he and plaintiff denied that she arranged the meeting.

Nolfi claimed that plaintiff thereafter instructed him to make the walls uniform and that work was approved by the seller and plaintiff's brother, so that he did make some repairs on the adjacent property and connected it with the work on plaintiffs' property. According to Nolfi the deviation increased the cost of the work on plaintiffs' property. He acknowledged re-

ceiving $600 from the escrow on the sale of the adjoining property for the work he did there.

Hightower testified the work was not constructed according to the plans because the contractor merely put a foundation under the house when the plans called for a combined foundation and retaining wall. He claimed that as a result he was unable to excavate outside to construct a car port which was a required adjunct to the use of an apartment he had constructed in the basement. Nolfi acknowledged that Hightower complained, and that he offered and started to put in a pillar to support the house so that an excavation could be made, but that he never completed the work because of further disputes which ended in the Hightowers hiring a lawyer.

No other testimony was offered as to the value of the work completed, or the damages suffered by reason of the manner in which the work was done. It would appear that the court subtracted the $600 received from the owners of the property next door from the $2,700 contract price. On the state of the evidence, in which a deviation was admitted, the finding that the work done had a value of $2,100, and the plaintiffs suffered damage under the contract to the extent of $600, cannot be faulted. The record permits the inference that by reconstructing the retaining wall to the east, the contractor may have saved on the depth of the foundation as planned and secured an additional $600 for little more than the work he originally undertook.[9]

V

In the third cause of action the plaintiffs sought $20,000 from each and all of the defendants because they maliciously, unjustly and unlawfully conspired together to encumber plaintiffs' property. The finding (XIII) with respect to the complicity of the other defendants in the forgery found to have been perpetrated by Nolfi has been reviewed above. The court further found, "XVIII [¶] That as a proximate result of the false, fraudulent, oppressive and malicious acts of the defendants, and each of them, other than defendant [notary], plaintiffs were damaged in the sum of $20,000.00" and awarded the plaintiffs damages in that sum, less a credit for the work done, against each of the defendants except the notary.

---

[9]Since nothing has been paid by the property owners, the effect of this conclusion is not to establish their right to $600 damages. It merely reduces the contractor's right, or the right of those standing in his place, to recover for the performance rendered. (See part VI below.) The fact that a contractor does not complete the work in accordance with the plans and specifications will not deprive him of all right to recover if there has been substantial performance. (See *Lowy* v. *United Pacific Ins. Co.* (1967) 67 Cal.2d 87, 92-93 [60 Cal.Rptr. 225, 429 P.2d 577]; and *Producers Holding Co.* v. *Hill* (1927) 201 Cal. 204, 208-209 [256 P. 207].)

"It is well settled that a conspiracy cannot be made the subject of a civil action unless something is done which without the conspiracy would give a right of action. The damage is the gist of the action, not the conspiracy. [Citations.] It is the wrong done and the damage suffered pursuant to the conspiracy which is the cause of action, rather than the conspiracy itself. [Citation.]" (*Wallace* v. *Kerr* (1940) 42 Cal.App.2d 182, 184-185 [108 P.2d 754].) See also *Vargas* v. *Giacosa* (1953) 121 Cal.App.2d 521, 524 [263 P.2d 840] [overruled on other grounds *Hardy* v. *Vial* (1957) 48 Cal.2d 577, 581 (311 P.2d 494)]. Plaintiffs recognize this rule and suggest, "In this case, the civil wrong suffered by plaintiffs was that their signatures were fraudulently obtained upon a promissory note and deed of trust, that they were grossly overcharged for work to be done upon their property, or in the alternative, that usurious interest was to be paid by them, that their property was threatened with foreclosure, and that title to their property was slandered by the recording of a false claim."

In support of finding XVIII, plaintiffs rely on the theory that title to their property was disparaged by the recording of a false claim, and they discuss the elements of that offense and the damages that may be allowed. These principles must be reviewed in connection with the contentions of Nolfi on this appeal. Since, as indicated above, the only wrongdoing in which the financier defendants participated was the abortive attempt to secure a note and deed of trust for a usurious loan, the damages assessable against them will be discussed separately.

In *Gudger* v. *Manton* (1943) 21 Cal.2d 537 [134 P.2d 217] [disapproved on other grounds *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 (295 P.2d 405)], the court adopted the definition of slander of title set forth in section 624 of the Restatement of Torts which reads as follows: "One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused." (See 21 Cal.2d at p. 541.)

In *Coley* v. *Hecker* (1928) 206 Cal. 22 [272 P. 1045] it was recognized that the recording of a document making a false claim to real property may constitute the publication of the disparaging matter requisite for a cause of action for slander of title. The court said, with reference to the alleged wrongful filing of an abstract of judgment, "It was the filing, maliciously and falsely, of a document which clouded the title of respondent that caused the injury. The effect would be the same had said document

been a forged deed, rather than an authorized abstract of judgment." (206 Cal. at p. 29. See also *Gudger* v. *Manton, supra,* 21 Cal.2d 537, 542; *Contra Costa County Title Co.* v. *Waloff* (1960) 184 Cal.App.2d 59, 66 and 67 [7 Cal.Rptr. 358]; and *Wright* v. *Rogers, supra,* 172 Cal.App.2d 349, 366.)

Plaintiffs clearly established a cause of action against Nolfi for securing and causing to be recorded an instrument which the court found was in effect a forgery. They claim the award of $20,000 for this wrong must be upheld because of the following rule, "One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness. [Citations.]" (*Zinn* v. *Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, 297-298 [149 P.2d 177]. See also *Wright* v. *Rogers, supra,* 172 Cal.App.2d 349, 367.)

In the case last cited the court noted with approval provisions of section 3333 of the Civil Code and section 633 of the Restatement of Torts,[10] and concluded, "In an action for disparagement of title the plaintiff may recover as damages the expense of legal proceedings necessary to remove a cloud on the plaintiff's title." (172 Cal.App.2d at p. 366.) The court also noted, "It has been held that in an action for disparagement of title, damages may be awarded for the inconvenience and time suffered by the plaintiff in the removal of a recorded cloud on his title. [Citation.] There is no express testimony of the amount of damage as a result of these matters, but their character is such that the trial judge could call on his general knowledge of their amount. [Citations.]" (*Id.,* pp. 366-367.) In that case the court sustained a finding of $2,000 compensatory damages on evidence which reflected that the recording of the forged instruments had subjected the property to equitable liens which were over $2,000 in excess of the encumbrances against the property before the transaction. (*Id.,* pp. 365-366.) In *Gudger* v. *Martin, supra,* applying similar principles, the court upheld an award of the difference between the sum offered for a residence, wrongfully encumbered by a writ of execution in an amount in excess of that offer, and the

---

[10]Section 3333 of the Civil Code provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Section 633 of the Restatement reads as follows: "The pecuniary loss for which a publisher of disparaging matter is liable under the rules stated in §§ 624 and 626-627 is restricted to (a) that pecuniary loss which directly and immediately results from the impairment of the vendibility of the thing in question caused by publication of the disparaging matter, and (b) the expense of litigation reasonably necessary to remove the doubt cast by the disparagement upon the other's property in the thing or upon the quality thereof."

fair market value of the property at a subsequent date when the writ was released (21 Cal.2d at pp. 552-555). In *Contra Costa County Title Co.* v. *Waloff, supra,* the court sustained an award of $1,000 general damages and $500 attorney's fees on evidence of actual damages which totaled $1,085 and attorney's fees totaling $1,000, of which the court attributed one-half to the portion of the action quieting plaintiff's title (184 Cal.App.2d at pp. 67-68).

In this case evidence was taken concerning the attorney's fees incurred by plaintiffs. Plaintiff testified she had paid $2,050 in attorney's fees. Cross-examination leaves it uncertain whether some of that sum was incurred in connection with the plaintiffs' difficulties with the city authorities, and to what extent any fees were paid. The record is clear that the plaintiffs intended to pay $2,700 for the work in instalments of $40 per month to commence on the completion of the work and to be represented by a note secured by a deed of trust. From the foregoing the maximum compensatory damages for the recording of the deed would be $2,050 for attorney's fees to remove the lien, and $750 for the extra bonus on the note which increased the lien beyond the sum contemplated. (The $600 damages for breach of contract arising after the recording of the deed of trust should not be confused with the cause of action for slander of title. See part IV above.)

Plaintiffs seek to justify the $20,000 award as exemplary damages. Section 3294 of the Civil Code provides, "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." There is authority for the proposition. ▮▮▮ "The fact that exemplary damages finds no express mention in the prayer of the complaint does not preclude the allowance of such damages upon a contested trial. [Citation.]" (*Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 606 [191 P.2d 432]. See also *Oakes* v. *McCarthy Co.* (1968) 267 Cal.App. 2d 231, 264 [73 Cal.Rptr. 127]; *Rogers* v. *Kabakoff* (1947) 81 Cal.App.2d 487, 491-492 [184 P.2d 312]; and *Turner* v. *Whittel* (1934) 2 Cal.App.2d 585, 590 [38 P.2d 835].) In *Oakes* v. *McCarthy Co., supra,* the court stated, on the authority of the earlier cases, ". . . where the body of the complaint sets forth facts upon which an award of punitive damages may be predicated, even the complete absence of a prayer constitutes no obstacle to an award of punitive damages." (267 Cal.App.2d at p. 264.) Although *Vaughn* v. *Jonas* and the earlier cases involved allegedly malicious assaults, the court in *Oakes* stated, "The words, 'oppression, fraud, or malice' are in the *disjunctive* and any of them may be 'express or implied.' Fraud alone is

an adequate basis for awarding punitive damages. [Citations.]" *(Id.* at pp. 262-263.)

In *Wright* v. *Rogers, supra,* the court recognized the right to exemplary damages in an action for slander of title. The court pointed out that it was a case of fraud, forgery and disparagement of title by the recording of a forged grant deed, and execution and recording of deeds of trust to lenders in order to secure funds to pay off original first lien and to renew the second lien with the result that the liens against plaintiff's property were increased by over $2,000 and she was no longer the owner of record. The court quoted with approval from *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 743 [336 P.2d 534], as follows: " 'Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer. [Citations.] Such damages are appropriate in cases like the present one, where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained. [Citation.]' " (See 172 Cal.App.2d at pp. 362-365 and 368.)

Plaintiffs also have pointed out, as stated in *Rogers* v. *Kabakoff, supra,* that it is not necessary that exemplary damages "be segregated in the findings from the actual damages awarded, unless such segregation be requested." (81 Cal.App.2d at p. 492. See also *Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308, fn. 8 [81 Cal.Rptr. 855, 461 P.2d 39]; and *Turner* v. *Whittel, supra,* 2 Cal.App.2d 585, 590.)

Nevertheless it is concluded that the judgment against Nolfi should be set aside because of the uncertainty of the compensatory damages assessed against him for obtaining and recording the forged deed of trust, and the lack of evidence to sustain an award of $20,000 punitive damages. In *Rosenberg* v. *J. C. Penney Co.* (1939) 30 Cal.App.2d 609 [86 P.2d 696], the court stated: "In considering whether or not the awards were excessive, we realize the very familiar rule that to the jury, to a very large extent, is committed the responsibility of awarding compensation for an injury sustained. When the award, as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, the duty is then imposed upon the reviewing court to act." (30 Cal.App.2d at p. 628. Approved in *Cunningham* v. *Simpson, supra,* 1 Cal.3d 301, 308-309. Cf. *Oakes* v. *McCarthy Co., supra,* 267 Cal.App.2d 231, 263; and *Austin* v. *Duggan* (1958) 162 Cal.App.2d 580, 584 [328 P.2d 224].)

In this case the actual loss to plaintiffs could not exceed the sum of $750, plus their attorney's fees, or at most, on the record, $2,800. The court

necessarily found that they were entitled to more than six-fold exemplary damages without taking any evidence of the resources of the alleged wrong-doers which it sought to punish. In *Austin* v. *Duggan, supra,* the court observed, "And while exemplary damages should bear a reasonable relation to the actual damages, there is no fixed ratio by which to determine the proper proportion between compensatory and exemplary damages." (162 Cal.App.2d at p. 584. See also *Oakes* v. *McCarthy Co., supra,* 267 Cal. App.2d 231, 263.) Nevertheless, an examination of the examples assembled in *Cunningham* v. *Simpson, supra* (1 Cal.3d at p. 319) and *Oakes* v. *McCarthy, supra* (267 Cal.App.2d at pp. 263-264) does not shake the conclusion that the award made was the result of passion or prejudice engendered by a failure to properly determine the compensatory damages awardable, and to appraise the wealth of the wrongdoer. (Cf. *Oakes* v. *McCarthy Co., supra,* 267 Cal.App.2d at p. 264.)

Analysis of cases involving transactions similar to that involved in this case strengthens the conclusion that the judgment must be reversed and the case remanded for a redetermination of the compensatory and punitive damages to be assessed against Nolfi. In *Harris* v. *Gallant, supra,* the plaintiffs were led to sign a note and deed of trust which called for a discount and payments prohibited by the provisions then found in section 3081.5 of the Civil Code (see Bus. & Prof. Code, § 10244) by misrepresentation that they were signing a note at a lower rate of interest and a more distant maturity than those actually set forth in the note. The discount was $550, added to the $1,250 actually received. The plaintiffs recovered treble $376.41 usurious interest paid, and $500 exemplary damages for the fraud in inducing the execution of the note. (See 183 Cal.App.2d at pp. 100-101.) In *Wright* v. *Rogers, supra,* the court awarded $2,000 compensatory damages, and $2,000 punitive damages against those defendants responsible for securing and recording a forged deed. (See 172 Cal.App.2d at pp. 352 and 365-368.) In *Austin* v. *Duggan, supra,* the court approved an award of $1,500 exemplary damages, in connection with general damages of $740.45 awarded the purchaser of an existing secured promissory note, for the fraud of the sellers. (See 162 Cal.App.2d 582 and 584.) The court noted "the amount awarded appears large in relation to the amount of compensatory damages." In *Devers* v. *Greenwood, supra,* the court found the plaintiff's agent had wrongfully converted loan proceeds to which the plaintiff was entitled in the sum of $560.87, and had fraudulently secured her signature to a note for $400 and a deed of trust which was recorded but reconveyed when suit was filed. $500 exemplary damages were allowed. (See 139 Cal. App.2d at pp. 346-347, 349-350 and 352.)

## VI

In the absence of evidence to connect the financier defendants with the alleged forgery they are not responsible for damages for slander of title. There remains for determination the question of their liability for conspiracy to make a usurious loan (part III above). In two of the cases involving usury, exemplary damages were awarded the borrower. (See *Harris* v. *Gallant, supra,* 183 Cal.App.2d 94, 100-101; and *Devers* v. *Greenwood, supra,* 139 Cal.App.2d 345, 350.) Examination of these cases reflects that the damages were awarded in the former case because the borrower was led to sign a note with terms other than as represented, and in the latter case because the agent had defrauded his principal.

In *Heald* v. *Friis-Hansen, supra,* the remedies of the borrower are set forth as follows: "In the absence of fraud by the borrower, the parties to a usurious transaction are not *in pari delicto,* and, where a loan agreement calls for usurious interest, the borrower may recover any interest paid. [Citations.] . . . [¶] The Usury Law (Stats. 1919, p. lxxxiii; Deering's Gen. Laws, 1954, Act 3757), which was approved as an initiative measure prior to the adoption of section 22 of article XX of the Constitution, states in sections 1 and 2 that the maximum permissible rate of interest is 12 dollars on 100 dollars for one year, and section 3 provides that where interest is paid in excess of the amount 'allowed to be received under the preceding sections, one and two,' the borrower may recover treble the amount so paid." (52 Cal.2d at p. 837, fn. omitted.) "[¶] Section 3 of the Usury Law, as we have seen, makes the award of treble interest depend upon a payment of interest in excess of the amount allowed by sections 1 and 2, and the 10 per cent rate, which because of the constitutional provision is to be read into sections 1 and 2, is the rate to be applied in determining whether treble interest is to be awarded. . . . [¶] ██ The recovery of treble the amount of interest paid is allowed only where the actual payments of interest are in excess of the maximum permissible rate. [Citations.]" (*Id.,* p. 839. See also *Janisse* v. *Winston Investment Co., supra,* 154 Cal.App.2d 580, 582.)

"In order that the penalty may be enforced and damages obtained on account of the exaction of usurious interest either as interest or by way of a bonus, it must be made to appear that the usurious interest has actually been paid or that the bonus, which, taken together with the interest, stamps the transaction as usurious, must be shown to have been paid." (*Smith* v. *G. Cavaglieri Mortgage Co., supra,* 111 Cal.App. 136, 144. See also *Haines* v. *Commercial Mortgage Co., supra,* 200 Cal. 609, 618; and *Clarke* v. *Horany, supra,* 212 Cal.App.2d 307, 310.) ██ ██ The court made no

finding with respect to usury,[11] or, directly, with respect to the payment of $80 which defendants acknowledged receiving and plaintiffs denied making. It must be assumed that the trial court found that the payment was not made, because it did find that plaintiffs had no knowledge of the lien of the deed of trust until they received a copy of the notice of default (cf. fn. 4 above), and the $80 was not referred to in the damages. The plaintiffs, therefore, are not entitled to recover, or have credited against the amount actually advanced, any interest paid, much less treble such an amount. The mere setting up of the excess principal, $3,450, as due for an advance of $2,700, is not a payment of the $750. (See *Smith* v. *G. Cavaglieri Mortgage Co., supra,* 111 Cal.App. at pp. 139, 147-148.)

In *Rice* v. *Dunlap, supra,* the trial court upon finding the transaction usurious denied all recovery to the lender. The court held, "The plaintiff is entitled to recover the amount of the principal loaned to the defendant (*Haines* v. *Commercial Mortgage Co., supra* [200 Cal. 609, 622-624]), together with costs and attorney's fees provided for in the note. It is only the illegal portion of the contract, i.e., the portion relative to the interest charge, which is void and unenforceable." (205 Cal. at p. 136. See also *Rochester Capital Leasing Corp.* v. *K & L Litho Corp.* (1970) 13 Cal. App.3d 697, 703 [91 Cal.Rptr. 827]; *Harris* v. *Gallant, supra,* 183 Cal. App.2d 94, 100; and *Janisse* v. *Winston Investment Co., supra,* 154 Cal. App.2d 580, 583-584.)

It is apparent that if the note and deed of trust had been genuine, the only relief to which plaintiffs would have been entitled against the financier defendants would be to have the foreclosure sale enjoined upon paying up the sum of $40 per month, to be credited against principal, for the period which had transpired when suit was filed, and for each month thereafter. Such a judgment was approved in *Janisse* v. *Winston Investment Co., supra* (154 Cal.App.2d at pp. 583-584); and in *Harris* v. *Gallant, supra,* the court reversed a judgment which had declared the note and deed of trust void, and ordered a judgment decreeing that the unpaid balance of the money actually loaned should be paid by the borrowers

---

[11]No formal amendment setting forth a cause of action for usury was ever filed (see fn. 2 above). In *Wallace* v. *Zinman, supra,* the court observed with respect to a statutory limitation on expenses which was found unconstitutional ". . . in such case it would not be necessary to present such defense by answer or other pleading, but when the illegality of plaintiff's contract appeared, it would be the duty of the court *sua sponte* to deny all relief. [Citations.]" (200 Cal. at p. 589.) So here, the issue of usury having been raised and appearing on the record, the trial court, and this court, may dispose of it despite the absence of a formal pleading. Insofar as the defendants' plea of the statute of limitations is concerned, it may be noted that no part of usurious payment is barred by the statute of limitations as long as the usurious loan remains unpaid. (*Shirley* v. *Britt* (1957) 152 Cal.App.2d 666, 670 [313 P.2d 875].)

at the contemplated monthly rate, without interest, and that the lenders should be enjoined from accelerating the note or foreclosing the deed of trust as long as the payments were made (183 Cal.App.2d at pp. 100-101). Here, of course, the five or six years necessary to pay off $2,700 at the rate of $40 per month had long expired prior to the date of judgment, March 6, 1970, and the stay would have been dependent on the payment of the full sum which the plaintiffs agreed to pay under the proposal.

Here the note and deed of trust were properly found null and void and of no legal effect because of the forgery, and their enforcement must of necessity be enjoined. This case being equitable in nature it was incumbent on the trial court to dispose of all the issues presented by the case. ▮▮▮ It found that the plaintiffs agreed to give the contractor a note for $2,700 and deed of trust on completion of the work. That agreement created an equitable lien on the property when the work was completed. (See 1 Witkin, Summary of Cal. Law, Security Transactions in Real Property, § § 8 and 9, pp. 706-707.) The funds for the work were actually advanced by Keith Company, which, if it had received a genuine note and deed of trust, would have been entitled to enforce them to the extent of $2,700. To the extent that consideration was furnished to the plaintiffs, i.e., $2,100 as found by the court,[12] Keith Company should have an equitable lien as assignee of the contractor's rights, and to prevent the unjust enrichment of plaintiffs. (See *Jones* v. *Sacramento Sav. & Loan Assn.* (1967) 248 Cal.App.2d 522, 530 [56 Cal.Rptr. 741]; and note *Haines* v. *Commercial Mortgage Co., supra,* 200 Cal. 609, 624.) Plaintiffs' title should not be quieted until that lien, without interest prior to judgment, is satisfied.

▮▮▮ It should be pointed out again that the conspiracy to exact usurious compensation for the loan, which is implicit in the broader, but unwarranted, finding of the court, does not furnish a basis for awarding exemplary damages against the financier defendants. Since it is not wrong to demand excessive compensation for the use of money except as the practice may be prohibited by law, the law itself must be consulted for the penalties to be imposed. Moreover, the usury can only arise by reason of an agreement, executed or executory, to receive compensation for the loan or forbearance of money in excess of the rate provided by the Constitution and the usury law. Therefore, the wrong involved is dependent on a contract. (Cf. Civ. Code, § 3294, *supra.*) Finally the law having pro-

---

[12]The rights being equitable, rather than as predicated on the note, the plaintiffs should be able to assert that the consideration they received only amounted to $2,100 although they bargained for $2,700.

vided that the lender may recover his principal, it would be inconsistent to add to the statutory penalty of loss of the interest which is contracted for, and treble that interest which has been paid within a year preceding the bringing of an action.

The judgment is reversed, except as to the defendant notary, with directions to reassess the compensatory and exemplary damages due from the defendant Nolfi, and to revise the findings of fact, conclusions of law, and judgment with respect to the remaining defendants in accordance with the views expressed in this opinion.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied June 12, 1972, and respondents' petition for a hearing by the Supreme Court was denied July 12, 1972.